**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank J. ANDREWS, Walter Owens, Peter A. Andrews, Jr., Willard Whitley, Gus Postell, Louis Tye, Frank D. Andriola, Russell A. Malone, Defendants-Appellants.**

**No. 15623.**

United States Court of Appeals
Sixth Circuit.
June 17, 1965.

James L. Cobb, Jr., Covington, Ky., and Daniel W. Davies, Newport, Ky., for appellants, Morris Weintraub, Newport, Ky., on the briefs, Jacob Kossman, Philadelphia, Pa., of counsel.

William S. Lynch and Philip J. Hoskins, Attys., Dept. of Justice, Washington, D. C., for appellee, Herbert J. Miller, Jr., Asst. Atty. Gen., Washington, D. C., on the brief.

Before MILLER, CECIL and EDWARDS, Circuit Judges.

EDWARDS, Circuit Judge.

These appeals are from convictions for conspiracy to violate, and specific violations of the Internal Revenue Statutes by fraudulently concealing and withholding gambling excise taxes.

The first count of the indictments was a conspiracy count and the balance of the counts, 2 through 32, consist of the substantive counts of willful understatement of or failure to pay the excise taxes. Count 33 charged violation of the Federal Communications Act, and Counts 34 and 35 charged willful failure to register and pay the wagering occupational tax.

Defendant Frank J. Andrews was found guilty on Count 1 and received a sentence of five years and $10,000 fine. Defendant Daniel Andrews was severed because of his illness. The other seven defendants were found guilty on Count 1 and on a variety of the substantive counts. They were sentenced to terms of five years on each count for which they were convicted, except that Peter A. Andrews and Russell A. Malone were sentenced to only one year for their convictions on Counts 34 and 35. All seven were also fined $10,000 for conviction on Count 1. All of the sentences were made to run concurrently.

This trial was a sequel to large-scale,[1] illegal but wide open gambling operations in Newport, Kentucky. This record clearly establishes the nature and extent of the gambling. Indeed, no defendant, other than Frank Andrews, takes the trouble to deny being in the "business" of gambling during the time concerned. All do deny conspiring to evade federal wagering taxes and the substantive offenses charged.

Each of the several briefs filed on behalf of defendants argues the insufficien-

---

1. Computations of government evidence indicate total wagers during the times concerned of over five million dollars and a total tax evasion of over four hundred thousand dollars.

cy of the evidence to support the verdicts and in this regard relies upon the applicable law as set forth in Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). In that case the United States Supreme Court affirmed convictions as to defendants Ingram and Jenkins (described as "entrepreneurs") and reversed as to defendants Smith and Law (described as "relatively minor clerical functionaries").

The Court's distinctions are set forth in the majority opinion of Mr. Justice Stewart thus:

> "But the evidence of agreement between Ingram and Jenkins to operate this gambling enterprise, which operation made them liable for federal taxes, and to conceal its operation and its income is clear on this record, and is virtually conceded by the petitioners. The evidence was sufficient to support a conclusion that they were engaged not only in a conspiracy to operate and conceal their gambling enterprise, but that they were also parties to an agreement to attempt to defeat or evade the federal taxes imposed upon the operators of such a business.

> "As to Smith and Law, the case is quite a different one. While the record clearly supports a finding that Smith and Law were participants in a conspiracy to operate a lottery and to conceal that operation from local law enforcement agencies, we find no warrant for a finding that they were, like Ingram and Jenkins, parties to a conspiracy with a purpose illegal under federal law. Certainly there is nothing in the record to show that Smith and Law knew that Ingram and Jenkins had not paid the taxes, a fact obviously within the knowledge of the latter. * * *" Ingram v. United States, supra at 677, 79 S.Ct. at 1319.

Thus, we take it, convictions for conspiracy to evade federal gambling tax laws cannot be sustained absent proof 1) that defendants were parties to an agreement to defeat or evade the taxes, or 2) that defendants had knowledge that the taxes were due and were not being paid, plus conduct in furtherance of a plan to evade them.

We regard this record as establishing beyond all peradventure of a doubt at least two substantial, deliberate and interrelated schemes for large-scale federal tax evasion. The first such scheme relates to a method for reporting approximately one-quarter of the taxes actually due on the "day" numbers game and other related gambling activities. As testified to by Ruth Jane Siuda, one of the six girls who "ran the work" on the "day" numbers, it was her job after the totalling of the work and after the hits had been determined to "pull the work." Her testimony leaves no doubt that this meant extracting the most convenient one-quarter of the bet slips so as to show a total take of $1,500–$2,000 per day, whereas in fact the daily total on this operation was $8,500. (See Appendix A.) The federal tax returns show clearly that taxes were paid only on the work thus "pulled."

The second major scheme for tax evasion involved the operation of a "night" numbers game. The record clearly establishes that no taxes were paid on this game at all, and it is argued to us that we should read the record as establishing that this game was within the exception to the wagering tax statute. Int. Rev.Code of 1954, § 4421(2)(A).

The evidence, however, is overwhelmingly to the contrary, as obviously the jury found. It is patent that many of the persons participating in the "night" numbers operation were not on the premises at the time of the declaration of the winners and that the fact situation here involved large-scale telephone bet procedures, as well as the writing of bets off the premises.

As to Walter Owens, Willard Whitley, Peter Andrews, Jr., and Gus Postell, there can be no doubt about their status as entrepreneurs in relation to one or the other of the two major tax evasion schemes which we have referred to above. The records of the gambling partner-

ships, the tax return forms, and the testimony of Internal Revenue Supervisor William R. Tabb, and Agent Robert L. Thomas is ample to establish this.

We believe that the testimony of the Revenue Agents, plus Government Exhibit 305 (See Appendix B) is sufficient evidence from which the jury could have found Louis Tye and Frank ("Bud") Andriola guilty on the conspiracy count as entrepreneurs likewise. Furthermore, there was testimony by a government handwriting expert that Exhibit 305 was in the handwriting of defendant Frank J. Andrews. (See Appendix C.)

As to Russell A. Malone, the testimony clearly indicates his role in advertising that no taxes were paid on the "night" numbers game, while at the same time assuring bettors that they did not in fact have to be present to win. Hence, his conviction on the conspiracy count seems warranted by the evidence herein. We regard it as consistent with the second of the two evidentiary standards set forth by Justice Stewart in the *Ingram* case.

As to defendant Frank J. Andrews, the evidentiary situation relating to Count 1 is quite different. He was admittedly owner of "The Sportsman's Club" wherein these wide open gambling operations were conducted. It is his contention that his relationship to the club was entirely that of owner of the building and the landlord of those defendants who rented the premises. There is, however, strong circumstantial evidence that defendant Frank J. Andrews was more than a landlord. The unconcealed nature of the gambling operations conducted at his Sportsman's Club, his presence on the first day of the "consolidated operation" of the numbers business, his ordering the installation of the burglar alarm system at the new Sportsman's Club, his visits to the bookkeeping room where the girls "ran the work," the testimony which indicates that it was he who dealt with the competitive threat of Junior Andrews' location, the fact that he hired one of the telephone operators for the "night" numbers game, and the fact that substantial

sums were paid out of the "day" numbers proceeds for taxes or rental owed by defendant Frank J. Andrews personally all represent facts from which this jury could have inferred that defendant Frank Andrews had an entrepreneurial relationship to the gambling operation at the Sportsman's Club and knowledge of the two schemes for tax evasion which we have previously described.

Perhaps the most significant bit of evidence pertaining to Frank Andrews' knowledge and participation in the "day" numbers tax evasion scheme is the testimony which clearly establishes that Frank Andrews paid for construction of a hidden closet at the Sportsman's Club. This closet, controlled by an electrical attachment which "could be opened by touching two nails," was discovered at the time of the August 1961 raid. It contained the "pulled" and "bundled" work for July 1961. Testimony indicated that such "bundles" amounted to less than one-fourth of the total wagers. But the total of the "bundled" work found in the secret closet corresponded exactly with the amount of wagers reported for tax purposes for the month of July 1961.

In addition, testimony showed deposits of $103,000 in defendant Frank Andrews' bank account between October of 1960 and August of 1961. Many of these deposits to Andrews' account were made by an agent of the "day" numbers gambling partnership and over 100 of the checks deposited had symbols on them which were identified as the symbols of various numbers writers.

■ In short, we believe that the evidence of a substantial conspiracy to evade and defeat the payment of federal wagering taxes was overwhelming and that there was ample evidence to support the jury findings of guilty as to the conspiracy count of the indictment as to all of the defendants in this case within the rule of Ingram v. United States, supra.

■ As to the substantive counts, we do not contemplate such detail. Again, the proofs of willful evasion of taxes

offered by the government to support the various counts was overwhelming and uncontroverted.

The meticulous care with which the jury dealt with the individual indictments in this trial is demonstrated by the highly specific verdicts which were returned:

"We the jury find the defendants as named.

"Frank J. Andrews Guilty on Count 1—undecided on counts 2 thru 33.

"Walter Owens guilty on counts 1 thru 33.

"Peter A. Andrews, Jr., guilty on counts 1 thru 29 and 33–34–35.

"Willard Whitley guilty on counts 1 thru 33.

"Gus Postell guilty on counts 1 thru 15 and 33. Not guilty on 16 thru 32.

"Louis Tye guilty on counts 1 thru 33.

"Frank Andriola guilty on counts 1 thru 9 and 33.

"Russell Malone guilty on counts 1 and 34, 35.

"MELVIN HART, Foreman."

We have read the record and believe that there is ample proof to support the verdicts just recited.

The other important issue argued in this case pertains to the complaint, particularly by defendant Frank Andrews, that pretrial and during trial publicity deprived him of due process of law and a fair and impartial jury trial.

This court has dealt recently and extensively with due process violation claims asserted to have been caused by press media prior to and during a criminal trial. Sheppard v. Maxwell, 346 F. 2d 707 (C.A.6, 1965). Decided May 5, 1965.

It is certain that defendant's claims as to publicity do not begin to approach in quantity or possible prejudicial impact those asserted and rejected by the majority opinion in Sheppard.

As to the standards set in the dissenting opinion, the distinctions between the publicity impact upon this trial as compared to the Sheppard trial are numerous and important.

This was not a capital case.

There is no indication of public shock in this community over the crime of federal tax evasion being charged. This community had indeed been quite tolerant of defendant's "business."

It should particularly be noted in this regard that defendants never moved for a change of venue.

The trial judge was not a candidate for an immediately forthcoming judicial election; and certainly no one could say from this record that the press was ever allowed to become "the dominant factor" in Judge Swinford's courtroom.

The admonitions to the jury not to read the newspapers or listen to radio or TV were in unmistakable language and repeated at every adjournment. See Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504 (1959); Estes v. United States, 335 F.2d 609 (C.A.5, 1964), cert. denied, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965).

The press comment on the trial, although frequently played on page one, was generally concerned with reporting what went into the trial record. The variances which were called to our attention do not in our judgment represent the "deliberate and highly prejudicial supplementation of the trial record" which was referred to in the dissenting opinion in Sheppard. See Sheppard v. Maxwell, supra, 346 F.2d at 738.

This record does not disclose extrajudicial contacts with and communications to this jury.

Finally, we have every reason to believe that the jury verdict in this trial was a "verdict * * * based upon the evidence developed at the trial." Turner v. State of Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965).

While appellants rely upon Briggs v. United States, 221 F.2d 636 (C.A.6, 1955); Marson v. United States, 203 F.2d

904 (C.A.6, 1953), and Stone v. United States, 113 F.2d 70 (C.A.6, 1940), we find the factual distinctions between this case and those relied on to be both significant and determinative. The facts in this case pertaining to claimed prejudicial publicity are directly comparable to those in Estes v. United States, supra.

We also believe that the trial judge committed no error in denying the motion to suppress the evidence seized in this case. Rule 41 of the Federal Rules of Criminal Procedure recites in part:

"The warrant shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States. * * *" Rule 41(c) Fed.R.Crim.P.

We have no doubt that the Internal Revenue Agents who served these warrants were properly designated under the terms of this rule. United States v. Sigal, 341 F.2d 837 (C.A.3, 1965); United States v. Pasha, 332 F.2d 193 (C.A.7, 1964), cert. denied, 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1965).

Further, we find no prejudicial error in Judge Swinford's charge when its language is taken as a whole and construed in context.

In this otherwise appropriate charge, however, the trial judge used two sentences which concern us. Referring to reasonable doubt he said: "It is not an excuse not to make a verdict. It is not a shield to hide behind to keep from carrying out your responsibility as a juror." We do not believe that this language is desirable. While it may be argued that this simply tells the jury that it is not any captious doubt which should cause them to withhold a verdict if otherwise convinced, it seems to us to place the Court in the position of urging a verdict with more emphasis than is appropriate.

These words also, however, must be viewed in relation to the totality of the Judge's charge on reasonable doubt. (See Appendix D.) Taken as a whole we believe that defendants suffered no prejudice therefrom.

In this regard and in relation to the numerous other issues presented by appellants which we have reviewed, we find no reversible error. Rule 52(a) Fed.R. Crim.P.; 28 U.S.C. § 2111.

Affirmed.

## APPENDIX A

(Testimony of plaintiff-appellee's witness Ruth Jane Siuda)

"Q. (By Mr. Lynch) How did that bundle come to be made?

"A. After we ran the work, the overlooks were pulled out of it, this, then I bundled the work.

"Q. Now, by 'bundled the work' what do you mean that you would do?

"A. Pull these books out of it and put a rubberband around it.

"Q. You would pull the books out?

"A. Yes.

"Q. By that you mean you would pull certain work out?

"A. Yes.

"Q. And how would the work ordinarily be placed, the work from which you would pull these books?

"A. It was all in boxes.

"Q. How many boxes for a day's work?

"A. Three.

"Q. Now, after you—observing the, this particular bundle dated 7/28/61, did you make the tape on that?

"A. Yes, I did.

"Q. How would you know which bundles to pull?

"A. Well, it was usually the same work all the time.

"Q. Well, would you have a particular figure or amount that you would pull?

"A. From 18 to $2,000.

"Q. And in addition to this work that you would pull in, the $18,000 to $2,000

that is a high figure, is that right? In other words, you would pull out a bundle that 18 would equal an $18 to $2,000 high?

"A. Yes.

"Q. What would be done with the other work?

"A. We would keep it three days and then put it in a box.

"Q. And what would happen to it after you put it in a box?

"A. I don't know what happened to it.

"Q. Well, what would you do with it?

"A. I wouldn't do anything with it, just put the work in the box.

"Q. Would you put the box in a particular place?

"A. Just left it in the office.

"Q. And when you came there the next morning would the box be there?

"A. No.

"Q. And the work that you put in this box after three days, the work that hadn't been pulled and bundled, were those the yellow bet slips?

"A. Yes.

"Q. Were those white sheets of paper the telephone work?

"A. Yes.

"Q. Now, do you know what proportion of the work that you would pull and bundle, what proportion that represented to the entire work for that particular day?

"A. Each day ran differently but I would say about a quarter of it.

\* \* \* \* \* \*

"Q. Well, after you did this bundling operation from the previous day's work, how much work would remain after that?

"A. Oh, three-fourths of it.

"Q. And how many boxes similar to boxes such as are shown in government exhibit 199, would the remaining unbundled work fill?

"A. I don't know that it filled it but there would be two boxes.

\* \* \* \* \* \*

"Q. Now, who would be the people who would go through the work and look for the hits?

"A. Who?

"Q. Who?

"A. All of us did it.

"Q. All of who?

"A. All the girls in the office.

"Q. Anyone else?

"A. We had about three girls, four girls come in.

"Q. Anyone else?

"A. Mr. Whitley, sometime.

"Q. Anyone else?

"A. Mr. Postell, sometimes.

"Q. Anyone else?

"A. No.

"Q. Now, after you went through and got the hits for each of the books, you would pull the tickets, mark them, somebody would compute the amounts of hits, is that correct?

"A. That's right.

\* \* \* \* \* \*

"The Court: What was the total amount of money taken in by the house on the day numbers?

\* \* \* \* \* \*

"The Court: Well, I mean from the time charged in this indictment, I don't think that is too material, but we will put it that way.

"Mr. Lynch: From the time she was in the Old Sportsman's Club, Your Honor, that would cover it.

"The Court: From the time you were in the Old Sportsman's Club. Can you give me that? If you can't just say you can't.

"The Witness: I would say roughly about, roughly, about $8500.00.

"The Court: Roughly $8500.00?

"The Witness: (Nods)."

APPENDIX B

(Testimony of Sidney William Macauley, Special Agent, Intelligence Division, Internal Revenue Service.)

"Q. (By Mr. Lynch) Now, turning to page 47 of this ledger, can you tell us what the figures are and will you demonstrate it on this machine and where the figures are obtained from?

\* \* \* \* \* \*

Government Exhibit No. 305

"A. (Continuing) This page 47 in the journal is dated July 2nd. The expense column—your income column. This is the expense column. This is the difference. Now, let's look at these figures here. Remember I went back a few pages, I went back five pages and the figure was $885 and some cents. The next page, the difference between expenses and income was $409 and then I read aloud the postings from the other pages, $1269, $1222, and this figure

$2415.68 is shown here as $2415. If you were to add these five weeks figures, you would arrive at $6300. If you take 50% of it, divide it in half, half of $6300 is $3150. There is a small word here, which I don't know if you can read it, but it says 'house.' We have '10% Bud,' 10% of $3150 is $315, shown here. You subtract $3150 and $315 from $6300, you arrive at $2835, and it is marked over here, 'Junior and Louis.'

"If you divide the remainder, 2835, in half, you get $1417.50, Louis; $1417.50, Junior. * * * "

## APPENDIX C

(Testimony of plaintiff-appellee's witness Edwin C. Schroeder)

"Q. (By Mr. Lynch) Showing you Government Exhibit 305, which is a ledger, referring you to page 47, of that ledger, and specifically to that portion of the page which has a series of figures on the righthand side with notations, '315 house, 315 10% Bud, Junior, Louis, Louis and Junior,' have you seen and made an examination of that?

"A. Yes.

"Q. Now, have you arrived at an opinion as to whether Government Exhibit 314, the slip with the 'Frank J. Andrews, O.K.', Government Exhibit 210–A the spiral notebook, the first page of the spiral notebook; and Government Exhibit 305, page 47 and the listings, the figures, the notations thereon, were written by the same person who wrote the signature cards which are Government Exhibit 237, signed by Frank J. Andrews, the American District Telegraph contract, which is Government Exhibit 299, and the checks, forming Government Exhibit 301?

"A. I have an opinion.

"Q. What is that opinion?

"A. It is my opinion that the writer of the various standard documents signed Frank J. Andrews is the author of the notations in the ledger, the lower right half, and the small slip of paper and the notations in the spiral notebook."

## APPENDIX D

"In the first place, these defendants, and each of them, are presumed to be innocent until their guilt is established to your satisfaction to the exclusion of a reasonable doubt. That presumption of innocence starts with them at the beginning of the case and remains with them throughout the trial, and must be overcome by evidence, before you can accept as evidence as establishing their guilt. You must start with the presumption that these defendants, and each of them, are innocent until their guilt is established to your satisfaction, as I say, to the exclusion of a reasonable doubt.

"The term reasonable doubt, as used in this instruction, is best defined by a use of the term itself. Don't be confused by reasonable doubt. It is not an excuse not to make a verdict. It is not a shield to hide behind to keep from carrying out your responsibility as a juror. It is very easy for a person in his own mind to say, "Well, true, I have a reasonable doubt," Well, that is a rather variable thing, what is reasonable and what is unreasonable. But I think as common sense men of everyday affairs, you do understand the difference between what is reasonable and what is unreasonable, and so this term reasonable doubt means just what it says. It is a doubt based upon reason, not some inconsequential doubt that might flit through the mind of a juror, not some slight mental hesitation that might guide you in determining the less sigificant affairs of everyday life; but a doubt for which there is reason, such a doubt as would guide you in determining the course of action in the conduct of your ordinary everyday living; a doubt based upon reason, not some shadowy, inconsequential misgiving.

"Few things are capable of proof to absolute certainty and while it is required of the law that the United States should establish its case to the exclusion of a reasonable doubt, it does not mean that the United States should prove its case beyond all doubt. And if it were so required, it would be practically impossible for the United States to success-

fully carry out the prosecution of the laws. So that term reasonable doubt is used in the sense which I have undertaken here to define it to you.

"Now, your verdict must be unanimous. You are not to arrive at a verdict by casting lots, by holding a primary election, by drawing straws, but your verdict must be unanimous. It must be the verdict of each juror. Each juror must make up his mind what the verdict should be. * * * *"