UNITED STATES of America, Plaintiff-Appellee,

v.

Frank DeNIRO, Jr., Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Michael DeNIRO, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Louis DeNIRO, Defendant-Appellant.

Nos. 17053–17055.

United States Court of Appeals Sixth Circuit.

April 15, 1968.

**754**

James J. Carroll, Cleveland, Ohio, for appellants; Samuel E. Karam, Youngstown, Ohio, on brief.

John P. Burke, Atty., Dept. of Justice, Washington, D. C., for appellee; Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., on brief; Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, of counsel.

Before WEICK, Chief Judge, and PECK and COMBS, Circuit Judges.

WEICK, Chief Judge.

The three DeNiro brothers, appellants here, waived a jury and were tried in the District Court on a five-count indictment charging them with (1) conspiracy; (2) attempted evasion of federal estate taxes; and (3), (4) and (5) making false statements to Internal Revenue Agents, in violation of 18 U.S.C. § 371, 26 U.S.C. (1964 ed.) § 7201, and 18 U.S.C. § 1001. At the close of the Government's case the DeNiros moved for judgments of acquittal. The court reserved ruling thereon, and they elected not to proceed further, and rested. They renewed their motion for judgment of acquittal. The court adopted findings of fact and conclusions of law, and found them guilty on counts 1 and 2, which charged conspiracy and the substantive offense of attempted evasion of federal estate taxes. The court dismissed counts 3, 4 and 5 of the indictment, which charged them with the substantive offenses of making false statements.

Frank and Michael were each fined one thousand dollars on count 1, and were placed on two years' probation on count 2. Louis was fined three thousand dollars on count 2 and sentenced to three years' imprisonment on count 1, the first ninety days of which sentence were to be spent in a jail type institution, and the remainder of the sentence was to be served on probation.

The charges arose out of the death of appellants' older brother, James Vincent DeNiro, known as Vince DeNiro, who had accumulated wealth in the numbers business in Youngstown, Ohio. Vince met his death when he endeavored to start his automobile, thereby detonating a bomb which someone had attached to the ignition switch. The court found that Vince died intestate, leaving a gross estate of $311,047.08 and a net taxable estate of $215,816.43, upon which the federal estate tax liability amounted to $55,444.93. Vince's estate was never probated.[1] His lawful heirs were his two children by his former wife, Mary DeNiro.

---

1. The gross estate was found to consist of the following: 100% ownership of Valley Land, Inc. (rental duplexes), with equity valued at $79,262.70; 100% ownership of Cicero's, Inc. (restaurant and bar), with equity valued at $101,000;

The Government's theory was that after Vince's death the three brothers, acting in concert, took possession of and appropriated all of the assets of Vince's estate, to the exclusion of his children who were his lawful heirs; that they concealed the assets and obstructed an investigation of Internal Revenue Agents by giving to them false statements to the effect that Vince left no estate and that they had none of his assets; and that one of their purposes was to evade payment of the federal estate tax.[2]

Although Vince had been quite successful in amassing wealth during his lifetime, he had always been careful to keep record title of his property in the names of others. This practice was graphically illustrated by the fact that not one of the assets of his substantial estate was actually recorded in his name. At least three persons, other than the brothers, discovered after Vince's death that they held title of record to property belonging to Vince.

The investigation by the Internal Revenue Agents originated as an inquiry into the failure of Louis DeNiro to file federal income tax returns for the years 1957, 1958 and 1959. It commenced on April 19, 1962, when Louis was interviewed by Special Agent John B. Relic. During the interview Louis denied that he received anything from Vince's estate, denied that Vince left an estate, and denied that he had received any substantial gifts from Vince during the latter's lifetime. Louis asserted that he was the owner of Cicero's; that he borrowed all of the money with which to purchase it; and that Vince had never owned any part of Cicero's. Subsequent interviews with Frank and Michael produced equally emphatic denials that Vince had left an estate. In a meeting on November 20, 1962, Louis told Relic that Vince had no interest in Cicero's or National Cigarette Service, and that he doubted whether Vince had any interest in Valley Land at the time of his death. He said that his brothers bought their interest in National Cigarette from Vince. Relic told Louis that the Government was interested in collecting taxes if there was any

---

55% ownership of National Cigarette Service, Inc., with equity valued at $80,-784.38; a $25,000-outstanding loan to an individual; and $25,000 in currency placed with a local banker for safekeeping. It might be pointed out that the 55% ownership of National Cigarette attributed to Vince is a conservative figure in view of the testimony of John Hughes, Administrator of the estate of his deceased brother, James Hughes. His testimony was to the effect that there was no stock in National Cigarette Service among the assets of that estate, which was probated in 1960. James Hughes was supposed to own a 10% stock interest in this company. Carl Rango also testified that although he had been listed as a partner in National Cigarette, he had never held such an interest.

**2.** The relevant provisions of the Code (Title 26) provide substantively as follows: Section 2001 imposes on a taxable estate of $100,000 to $250,000, a tax of $20,700 plus 30% of the excess over $100,000.

Section 2002 provides that the executor shall pay such tax.

In Section 2203 an executor is defined as the executor or administrator, or where none has been appointed, " * * * any person in actual or constructive possession of any property of the decedent."

Section 6018(a) (1) provides that the return shall be filed in all cases where the gross estate exceeds $60,000.

Section 6075 provides that the return shall be filed within fifteen months following the date of death.

18 U.S.C. § 371 provides in part:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, * * * and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

26 U.S.C. § 7201 provides:

"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

tax liability due.[3] Louis was also informed by Relic that there were criminal penalties for conspiring to evade estate tax liability, but Louis maintained that Vince had no interest in these companies.

In an interview on March 11, 1963, Special Agent Relic first told Frank, and then both Frank and Michael, that the Government was going to prosecute the brothers for attempted evasion of the estate tax liability of Vince, and might even charge them with conspiracy; that it was the position of the Government that Vince had an estate and that the brothers knew it and took over all the assets and divided the assets among themselves and wilfully tried to evade the estate tax. Special Agent Relic went over with them each of the items of the estate, but they persisted in their denials that Vince left any estate.

The District Judge found that the brothers were aware of Vince's practice of utilizing nominees and straws to conceal his ownership of property; that they were aware that Frank and Michael were serving as mere nominees in their ownership of National Cigarette stock, with beneficial ownership residing in Vince; and that they knew that at the time of his death Vince owned Cicero's (subject to a further payment of $32,000 to a former stockholder). The trial judge also found:

"On the date of Vince's death, the defendants * * * summoned Edward Cochran to Cicero's * * * and there they agree to gather together and secure permanent possession of these and all other properties which had belonged to their deceased brother to the exclusion of his rightful heirs."

The trial judge further found that the defendants knew that the investigation being conducted by Special Agent Relic could jeopardize the scheme to convert Vince's assets to their own use, and that, realizing this, the defendants—

" * * * agreed among themselves to lie to and mislead Agent Relic and the Internal Revenue Service about the true facts concerning the properties owned by their deceased brother. This they did well knowing that such a course of conduct would necessarily impede, impair, obstruct and defeat the lawful governmental function of the Revenue Service in the ascertainment, computation, assessment and collection of the revenue."

In the appeal appellants have urged three grounds for reversal. They are: First, that the District Judge erred in overruling the defendants' motions for judgments of acquittal; Second, that the evidence was insufficient to sustain the verdict; and Third, that there was insufficient evidence of willfulness.

■ In United States v. Carter, 311 F.2d 934, 940 (6th Cir.) cert. denied, Felice v. United States, 373 U.S. 915, 83 S.Ct. 1301, 10 L.Ed.2d 415 (1963), this court said:

"In determining whether the evidence was sufficient to withstand a motion for acquittal, the evidence must be viewed in the light most favorable to the prosecution. This rule applies to a case tried to a District Judge as well as to a case tried to a jury."

Even under a standard less stringent than that enunciated above, the defendants on the record here would not have been entitled to the relief which they sought. The trial judge properly overruled the motions for judgments of acquittal.

■ Going one step further, the appellants' contention that there is insufficient evidence to sustain the convictions, is likewise without merit. In our opinion, there was abundant evidence from which the trial judge could have found the defendants guilty of the crimes with which they were charged in counts 1 and 2 of the indictment. We will point out only the most damaging of this evidence.

Prior to its incorporation in 1955, National Cigarette was a partnership, in

3. Under the provisions of 26 U.S.C. § 6075 (see footnote 2), the return should have been filed not later than October 17, 1962.

which Vince held a 51% interest. Following incorporation, Vince was not listed as a stockholder, but instead Frank was shown as owner of 38% and Louis the owner of 17% of the total authorized shares.[4] Although Frank was the president of National Cigarette, he did not actually start to work for the company until early 1961, when business became "bad" in his used car lot. Michael began working for the company subsequent to Vince's death.

In August, 1961, Louis collected a $25,000-loan which had been made by Vince to Jules Aron, and which was evidenced by Aron's personal check, with Vince shown as payee. In October, 1961, the appellants collected the $25,000 which Vince had left with a bank official for safekeeping, by giving to the bank a surety bond to indemnify it against liability. After appellants gave the bond to the bank, the money was turned over to Frank.

The testimony of Edward Cochran shed considerable light on Vince's affairs. Mr. Cochran had been a business associate of Vince in both Valley Land and Cicero's. At one time Cochran had been the sole stockholder in Valley Land, but prior to his death Vince acquired complete ownership of that corporation. Shortly after its incorporation, Cochran and Vince each held a one-half interest in Cicero's, but in April or May of 1961 Vince agreed to and did purchase Cochran's share for $42,000, $10,000 of which had been paid at the time of Vince's death.

On the date of Vince's death, the brothers procured the services of an attorney to prepare options for National Cigarette to purchase from Helen Cochran and Dominic Frank shares of stock in Cicero's. The brothers represented to the attorney that they had purchased this stock and had nothing to show for it; and that the options were to reflect an actual prior verbal agreement to that effect. The options were prepared on the day of Vince's death and were backdated to January 30, 1961. The signatures of the necessary parties to the options were immediately obtained. (At this time, although Vince was the beneficial owner of all the shares of stock in Cicero's, the shares were of record in the names of Edward Cochran's wife, Helen Cochran, and Dominic Frank, a gentleman whose interest in Cicero's preceded that of both Cochran and Vince.) However, in December, 1961, when informed by the attorney that the minority stockholders of National Cigarette would by the terms of this agreement acquire an interest in Cicero's, the brothers had the attorney prepare new options running in favor of Louis, rather than National Cigarette.

The above recitals are but illustrative of the substantial evidence upon which the trial judge relied in finding the brothers guilty of attempted evasion of federal estate tax and of conspiring to commit the crime charged in count 1.

The third ground urged by the brothers for reversal is that they did not *willfully* evade federal estate taxes. They have maintained here, as they did in the court below, that even if it is demonstrated that they consciously converted the assets of Vince's estate to their own use, they did not do so with the requisite intent of evading federal estate taxes. It is their position that even though they may be guilty (and this they do not admit) of an attempt to defraud Vince's heirs, at no time was there intertwined with such scheme a purpose to evade the federal estate taxes on such assets.[5] It is strenuously argued that none of the

4. National Cigarette was incorporated with one hundred authorized shares. Although Frank and Louis claimed that they paid Vince five dollars per share for their shares, they immediately signed the certificates for the shares in blank, and these certificates and the certificates of three other record owners, endorsed in blank, were used indiscriminately by Vince as security for large personal loans.

5. Doubtless one of the purposes of the brothers' scheme was to deprive Vince's heirs of his estate, but they also conspired to evade the taxes due from the

brothers graduated from high school[6] and that none of them comprehended the nuances of federal estate taxation.

■ The essential elements of a tax evasion prosecution are summarized in Sansone v. United States, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965), where the court said:

"As has been held by this Court, the elements of § 7201 are willfulness; the existence of a tax deficiency * * *; and an affirmative act constituting an evasion or attempted evasion of the tax * * *."

In United States v. Andrews, 347 F.2d 207 (6th Cir.) cert. denied, 382 U.S. 956, 86 S.Ct. 431, 15 L.Ed.2d 360 (1965), this court in reviewing a conviction for willful evasion of the gambling tax, held that in order to sustain a conviction of conspiracy to evade those laws there must be knowledge on the part of the defendants that the tax is due and has not been paid. However, this knowledge need not be shown by direct evidence, and the circumstances of the case may be sufficient to show that the defendants knew that the tax was owed.[7]

In United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933), the court, in discussing a prosecution for willful refusal to supply information, said:

"The word [willful] often denotes an act which is intentional, or know-

ing, or voluntary, as distinguished from accidental. But, when used in a criminal statute, it generally means an act done with a bad purpose * * *; without justifiable excuse * * *; stubbornly, obstinately, perversely * * *."

The gravamen of Section 7201 is the specific intent or design to deprive the Government of taxes. Edwards v. United States, 375 F.2d 862 (9th Cir. 1967); United States v. Schipani, 362 F.2d 825 (2nd Cir.) cert. denied, 385 U.S. 934, 87 S.Ct. 293, 17 L.Ed.2d 214 (1966).

■ Thus, under the authority cited above, the brothers, in order to be found guilty, must have had the specific intent of evading the federal estate taxes. We are of the view that the record shows such precise purpose of mind. Even if it is conceded that in the formative stages of the scheme the brothers were ignorant of the federal estate tax, there came a point at which it was brought forcefully to their attention. On November 20, 1962, Louis was placed on notice by Special Agent Relic, of the Government's interest in collecting the federal estate tax, and of the criminal penalties for attempted avoidance of such tax.

On March 11, 1963, the other two brothers were given adequate notice by Relic of the claims of the Government with respect to the federal estate tax, and of the consequences of evasion.[8] In spite

---

estate. As was said by the court in Ingram v. United States, 360 U.S. 672, 679–680, 79 S.Ct. 1314, 1320, 3 L.Ed.2d 1503 (1959):

"A conspiracy, to be sure, may have multiple objectives, * * * and if one of its objectives, even a minor one, be the evasion of federal taxes, the offense is made out, though the primary objective may be concealment of another crime."

6. In Fowler v. United States, 352 F.2d 100, 111 (8th Cir. 1965) cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966), a prosecution for evasion of federal income taxes, the defendants were shown to have third and eighth grade educations, but the court remarked:

"* * * capacity is measurable by more than just * * * formal education."

7. See Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943); United States v. Schipani, 362 F.2d 825 (2nd Cir.) cert. denied, 385 U.S. 934, 87 S.Ct. 293, 17 L.Ed.2d 214 (1966).

8. As the court said in Hill v. United States, 363 F.2d 176, 180 (5th Cir. 1966) (involving income tax evasion prosecution):

"(W)here a defendant has an opportunity to correct his return, and is put

of the above, the brothers continued to maintain that Vince left no estate and that they owned the assets which the court found belonged to him.

The judgment of the lower court is affirmed.

on notice that such correction is necessary, his failure to take steps to file an amended return is a proper matter for a jury to consider in determining intent or lack of intent."