UNITED STATES of America, Plaintiff-Appellee,

v.

Matthew **RUBINO**, Defendant-Appellant.

No. 19621.

United States Court of Appeals, Sixth Circuit.

July 30, 1970.

John W. Peck, Circuit Judge, dissented and filed opinion.

Carl Ziemba, Detroit, Mich., for defendant-appellant; Joseph W. Louisell, Detroit, Mich., on brief.

Richard B. Buhrman, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee; Johnnie M. Walters, Asst. Atty. Gen., Joseph M. Howard, Atty., Dept. of Justice, Washington, D. C., on brief; James H. Brickley, U. S. Atty., Detroit, Mich., of counsel.

Before PHILLIPS, Chief Judge, and PECK and BROOKS, Circuit Judges.

PHILLIPS, Chief Judge.

Defendant-appellant (usually hereinafter "Rubino") was found guilty by jury verdict of each count of a four-count indictment charging willful attempt to evade and defeat his individual income taxes for the years 1958 through 1961. The trial extended over a period of nine weeks and Rubino was sentenced to two and one-half years imprisonment on each count, the sentences to run consecutively, and was fined $10,000 on each. His motion for a new trial on the basis that the court erred in not having granted a judgment of acquittal and in not declaring a mistrial was overruled, and this appeal followed.

The government's case was presented on a net worth-expenditures basis, and his income was established by that method. Rubino produced no personal books or records and advised Treasury agents at the beginning of their investigation that he would answer no questions. He maintained no bank account and conducted all of his business in currency, cashier's checks or money orders, and five or six months work by agents produced about twelve hundred cashier's checks which he had bought during the prosecution years. Rubino did not at any time during the investigation supply information that would account for any of the unreported income disclosed by the investigation.

Rubino's taxable income and income tax, in each instance both as reported and corrected, and their relationship to the counts of the indictment appear in the following table:

| Count | Year | Taxable Income Reported | Corrected | Income Tax Reported | Corrected |
|-------|------|------------|------------|------------|------------|
| I | 1958 | $ 31,637.79 | $ 61,166.71 | $10,371.51 | $ 27,305.11 |
| II | 1959 | 1,536.73 | 56,832.46 | 487.35 | 23,953.39 |
| III | 1960 | 26,114.57 | 70,081.93 | 7,925.26 | 32,526.12 |
| IV | 1961 | 42,134.72 | 56,801.10 | 15,538.75 | 24,161.11 |
|  |  | $101,423.81 | $244,882.20 | $34,322.87 | $107,945.73 |

In the course of the lengthy trial objections were made to the introduction by the government of both testimony and documentary exhibits and to other rulings of the trial judge, all of which have been preserved for review and constitute alleged prejudicial error. Passing those items for the moment, we first consider the contention of Rubino that publicity in Detroit newspapers, which occurred during the closing days of the trial, requires a reversal of the conviction.

The trial of this case began in the District Court November 18, 1968, with Attorney Joseph W. Louisell of the Detroit, Michigan, bar as Rubino's counsel. It continued through January 29, 1969, on which day the guilty verdict was returned. However, on January 21, 1969, in an entirely unrelated matter the Honorable Victor J. Baum, Circuit Judge for Wayne County, Michigan, announced his decision denying a motion for a new trial for one Vito Giacalone in a case resulting in the latter's conviction on a felony charge, and the announcement was in the form of a 90-page opinion. Giacalone had been represented by Mr. Louisell, and on January 21 the *Detroit News*, an afternoon newspaper, ran a story on the subject as did *The Detroit Free Press*, a morning newspaper, the following day. *The Detroit News* story featured pictures of Mr. Louisell and Judge Baum, and appeared under a headline proclaiming, "Louisell Accused of 'Cat and Mouse' Game—Baum Rebukes Vito's Lawyer." It quoted Judge Baum as accusing Mr. Louisell of making "a sham claim of hospitalization" to delay the trial for months and stated that Louisell was guilty of "a ruse and a pretext." *The Free Press* article made no mention of Rubino. *The Detroit News* stated, in four lines which were the eleventh paragraph in the latter story, that:

"Matthew (Mike the Enforcer) Rubino, reputed Mafia leader, has since gone to trial for income tax evasion in the Federal Court with Louisell as his lawyer. The trial is now in its second month."

*The Free Press* story appeared under the headline "Judge Accuses Louisell of Plot." It opened with this sentence:

"A judge accused Joseph Louisell, one of Detroit's most expensive and sought after defense attorneys, of using a subterfuge in an attempt to delay the trial of one of his clients, Mafia leader Vito Giacalone."

It then went on to quote Judge Baum as having said in his opinion, "There ought not to be one law for the rich and another for the poor. We do not allow the poor, unreasonably, to dam the flow of the court's business. We should not permit Vito Giacalone or Joseph Louisell unreasonably to delay justice." This story was also accompanied by photographs of Judge Baum and Mr. Louisell.

Immediately following the publication of these newspaper stories, a motion was made on behalf of Rubino to see which, if any, members of the jury had read them. Under a plan agreed to by counsel, each of the fourteen member jury panel (including the two alternates) was individually called from the jury room into the courtroom and there questioned by the trial judge. Following such interrogation, each juror was then escorted into the Court's chambers to prevent discussion with the remaining jurors prior to their questioning.

Four of the jurors testified that they had not seen either news story and five of the others said they had read only a headline. Eleven of the jurors were asked whether there had been any discussion of the articles in the jury room. This question was not directed to the first three jurors since it was not suggested until after they had been questioned. All eleven agreed that there had been no discussion, although three jurors stated that one of the articles was *mentioned* in the jury room. Apparently one of these three jurors had mentioned the article or the photograph of Mr. Louisell to the other two. Five of the jurors had read one of the articles

or a part of one of them. All jurors stated that the articles would have no influence on their verdict.

It is re-emphasized that the article in *The Detroit Free Press* related entirely to the trial of another defendant in the Wayne County Circuit Court. It made no reference to Rubino, the appellant herein. The story in *The Detroit News* also was directed to the same State court trial. In the four-line eleventh paragraph of the latter story, however, there was a recitation that Mr. Louisell was serving as counsel for Rubino in a trial which then was in its second month in the United States District Court. This paragraph described Rubino as a "reputed Mafia leader." This news story was published in at least two editions of *The Detroit News*. In the earliest edition the entire article appeared on the front page. In the succeeding edition or editions the article began on the front page but part of it was continued to an inside page. The paragraph relating to Rubino appeared on the inside page and not on the front page of the later edition or editions.

Of the five jurors who had read any part of either of the two articles, two had read *The Free Press* story which contained no mention of Rubino. One juror had read "a little bit" of one of the stories, but did not specify which newspaper. One juror had read the entire article in *The News*. The fifth had read only a portion of this article, and testified that she had read none of that part on the inside page, indicating that the edition she saw was a later edition in which the paragraph concerning Rubino appeared on the inside page, rather than the earliest edition in which the entire article was printed on the front page. The record demonstrates to our satisfaction that the import of the testimony of this fifth juror was to the effect that she did not read the paragraph relating to Rubino.

Thus the record establishes affirmatively that only one juror read the paragraph in which Rubino was mentioned as to which prejudice is claimed. De-

fense counsel did not request the District Judge to remove from the panel this juror who had read the entire article in *The Detroit News*, including the paragraph relating to Rubino. The two alternate jurors had not read the news stories in either of the papers and under the proof were unaware of any newspaper reference to Rubino as a reputed member of the Mafia. These two alternate jurors were available to have replaced any disqualified juror. No request was made for the replacement of any juror by an alternate.

Two copies of *The Detroit Free Press* of January 22, 1969, were recovered from the jury room by the bailiff. These papers made no mention of Rubino, and the evidence was that they had not been read by the jurors except to the extent narrated in this opinion.

The District Judge, basing his determination on his personal interrogation of the jurors who read the article or saw the headline referring to Mr. Louisell, made an affirmative finding of fact to the effect that the members of the jury were not influenced by this newspaper publicity and were competent to render a fair and impartial verdict in the case.

In his charge to the jury the District Court gave the affirmative instruction that "You are to consider only the evidence in this case." With respect to the newspaper stories, he told the jury as follows:

"Now, last week there appeared in the newspapers certain stories concerning Mr. Louisell in connection with another client, in another court. Some of you jurors read some or all of the newspaper accounts. The Court questioned you separately in an attempt to learn if those newspaper stories could in any way influence you in your judgment in this case. I tell you that if I had the slightest reason to believe that those stories might in any way, consciously or otherwise, affect your attitude or disposition toward this defendant or this case, I would unhesitatingly have declared a mistrial, selected a new jury and retried

the case. It is because you have convinced me that what you read, heard or discussed could in no way affect your judgment in this case that I have not done so. I am thus prepared to give this case to you for your determination with an absolute confidence that nothing that appeared in the papers will in the slightest affect the outcome of this case."

■ The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles relating to the trial. Marshall v. United States, 360 U. S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250. "Generalizations beyond that statement are not profitable, because each case must turn on its special facts." Marshall v. United States, *supra*, at 312, 79 S.Ct. at 1172.

In our opinion the contents of these two newspaper articles do not measure up to the degree of prejudice which resulted in reversal in *Marshall*. The article in *Marshall* contained highly prejudicial material which was read by seven of the twelve jurors. Those articles, among other things, made it clear that the defendant in that case twice previously had been convicted of felonies. It was held under the circumstances in *Marshall* that the defendant was deprived of a fair trial, despite the assurance by the jurors that the reading of the articles would not influence their verdict.

■ In the present case, where it is not shown that the newspaper stories came through or from the prosecution, it is our opinion that the burden of establishing that he has been treated unfairly rests upon Rubino. Marshall v. United States, 355 F.2d 999, 1007 (9th Cir.), cert. denied, 385 U.S. 815, 87 S.Ct. 34, 17 L.Ed.2d 54, rehearing denied, 385 U. S. 964, 87 S.Ct. 388, 17 L.Ed.2d 309. Rubino, in our opinion, has made no such showing in the record in the present case.

■ In our opinion the reported criticism by the State trial judge of Mr. Louisell's pre-trial activity in a wholly unrelated case was not sufficient, standing alone, to call for a new trial.

A more serious question is presented by *The Detroit News* article, which, although devoted almost wholly to the case in the Wayne Circuit Court, made reference in the eleventh paragraph to the fact that Rubino's trial for income tax evasion in the United States District Court was in its second month and mentioned him as a reputed member of the Mafia. The possibility that this paragraph may have influenced the verdict of the jury is minimized considerably by the fact that only two jurors are shown to have read any part of *The Detroit News* article containing this paragraph. Mrs. Zurvalec, who said she read the entire article, testified as follows:

"Q Yesterday certain news reports appeared regarding Mr. Louisell. The court would like to ask you, Mrs. Zurvalec, whether or not you have seen any news articles?

"A Yes, I did see that article in the News.

"Q If you saw this article, did you read it or any part of it?

"A I read it, yes.

"Q Has what you read influenced your ability to render a fair and impartial verdict in this case? A. I would say not. Well, it referred to another case, primarily, and I don't think it would have any bearing on this.

"Q Did you hear any radio reports regarding Mr. Louisell?

"A No, I didn't."

Mrs. Selewski, the only other juror shown to have read any part of the story in *The Detroit News*, testified that: "I read the front part of the paper, but I didn't get to the inside." Since the paragraph relating to Rubino was in that portion of the news story continued to the inside from page one in all except the earliest edition, we conclude, as hereinabove stated, that Mrs. Selewski

did not read the paragraph referring to Rubino.

The only other juror who may have seen any part of the story in *The Detroit News* under the evidence in the record was Mr. Stackpoole, who did not specify which article he saw. Even if it be assumed that Juror Stackpoole was referring to the *Free Press* story, the reading of a "little bit" presumably would not have included the eleventh paragraph which appeared on an inside page in all except the earliest edition.

Thus the record shows that of the fourteen jurors there was only one who is shown definitely to have read the entire article, including the four-line paragraph alleged to be prejudicial. We do not consider it to be without significance that defense counsel could have requested that this juror be replaced by an alternate, but failed to do so.

It is to be emphasized that these newspaper stories did not involve the trial in the United States District Court here on appeal, but to the contrary reported on a State court trial.

There is no contention that any of this publicity was generated by a representative of the United States. To the contrary the release of this publicity was beyond the control of the United States Attorney and United States District Judge who presided over the trial in the present case.

Throughout the trial the District Judge repeatedly cautioned the jury against reading any newspaper articles relating to the pending case or listening to any radio or television broadcasts concerning it.

■ The question on this appeal is whether two newspaper articles critical of defense counsel in an unrelated case, which was read in part by not more than five jurors, requires reversal of Rubino's conviction. In a period of recurring clashes between the right of free press guaranteed by the First Amendment and the right of trial by jury guaranteed by the Sixth Amendment, we are unwilling to reverse a con-

viction under the circumstances of the present case. In the absence of affirmative evidence of deprivation of a fair trial, we decline to establish a precedent which conceivably could permit counsel, purposely or otherwise, to obtain unfavorable publicity concerning himself in a local newspaper and thereby make it virtually impossible for a valid conviction to be effected against one of his clients in an unrelated case.

United States v. Cimini 427 F.2d 129 (1970, 6th Cir.) involved a factual situation concerning newspaper publicity which is similar to the facts in the present case. During the course of that trial publicity appeared in Detroit newspapers which was unfavorable to defense counsel. The record showed that most of the jurors at least were aware of the publicity and that it may have been mentioned in the jury room. Upon questioning by the Court, each juror testified that no publicity or any mention of it had affected his ability to render a fair and impartial verdict.

This Court affirmed the convictions, holding that there was not a sufficient showing of prejudice to justify reversal.

To like effect see United States v. Andrews, 347 F.2d 207, 211 (6th Cir.), cert. denied, 382 U.S. 956, 86 S.Ct. 431, 436, 15 L.Ed.2d 360, rehearing denied, 382 U.S. 1021, 86 S.Ct. 613, 15 L.Ed.2d 537.

In summary, the District Judge, after interrogating each juror separately, did not find the "slightest reason" to believe that the newspaper articles could influence the verdict in any manner. We conclude that the District Judge properly exercised his discretion by giving adequate cautionary instructions and overruling the motion for a mistrial.

■ We comment briefly upon other contentions made by Rubino. One argument is that prejudicial error occurred when during its opening statement to the jury the government was permitted, over his objection, to use a chart demonstrating the tax obligation of a fictitious "John Doe," which chart set forth fig-

ures completely irrelevant to the case at trial. Although the net worth-expenditures method has come to be recognized as a proper means of proving a taxpayer's income (Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); Thomas v. Commissioner of Internal Revenue, 223 F.2d 83 (6th Cir. 1955)) the fact remains that it is a difficult concept for the uninitiated juror. To overcome this obstacle, it has come to be common practice to use charts of the type here employed, which are usually referred to as "John Doe" charts. The use of the chart here in question by government counsel during the opening statement doubtless was of assistance to the jury in understanding the method employed, the explanation of the purpose of the use of the fictitious figures was fully explained, and the procedure did not constitute prejudicial error.

Rubino further argues that the trial court should have directed a verdict of acquittal of count one of the indictment for the reason that the government did not show that Rubino did not have a hoard of cash on hand on January 1, 1958, of some $25,000. Suffice it to say that the evidence received from the parties on this subject created an issue of fact and that there is evidence in the record taken as a whole to support the jury's verdict of guilty of count one.

Finally, Rubino contends that he was entitled to a directed verdict of not guilty on all four counts. Under this contention he repeats the argument made under his claim of entitlement to a directed verdict under count one on the ground that the government failed to show that he did not have a hoard of money on January 1, 1958. He further argues that the government failed to produce sufficient proof that the loan account of National Anode Corporation in his name was actually his sole investment rather than the joint investment of himself and one George Massu, and that he did not receive a loan of $50,000 from one Winderman.

All of these contentions simply present arguments going to the weight of the evidence. As we have already pointed out, there was evidence on both sides of the issues as to whether Rubino possessed a cash hoard at the beginning of the year 1958. Similarly, pro-and-con evidence exists in the record on the question of whether the National Anode loan was Rubino's or Rubino's and Massu's, and this situation also prevails with reference to the alleged Winderman loan. We feel constrained to observe on the basis of the record before us that while had the jury determined that Rubino possessed a cash hoard on January 1, 1958, that the National Anode loan was a joint Rubino-Massu investment and that appellant had borrowed $50,000 from Winderman we probably would feel required to permit the verdict to stand, we have no hesitation whatever in agreeing that the contrary resolution of these issues by the jury is supported by the greater weight of the evidence.

All the other contentions advanced by Rubino in support of his appeal have been considered. It is our conclusion that no reversible error is shown in the record.

Affirmed.

JOHN W. PECK, Circuit Judge (dissenting).

I regret that I cannot join in the majority opinion for a number of reasons.

While I am in wholehearted accord with the doctrine which extends to the trial judge a large discretion in determining when news articles have resulted in prejudice (Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L. Ed.2d 1250 (1959)), that exercise must be consistent with the facts set forth in the record. While the District Judge made no specific findings as to which and how many jurors read the offending material, the majority opinion undertakes a detailed summary in this regard. Unfortunately, I am unable to agree that these findings are supported by the record. For reasons which become apparent upon a reading of the transcript, it is impossible to state with certainty exactly how many members of the panel

had read certain articles or had heard discussions concerning them in the jury room.[1] A fair reading of the transcript of that hearing, however, would seem to establish that two members read the article in the Detroit News, two read the article in the Detroit Free Press, while another stated that he read an article without specifying the paper. Five other jurors stated that they saw one or another of the articles but did not read them. Only four of the fourteen testified that they had neither seen nor read either of the accounts. Two copies of the Free Press of January 22, 1969, were recovered from the jury room by the bailiff. The extent of the discussion within the jury room cannot, in my view, be satisfactorily determined.

While the statements of the jurors are accepted at face value, in passing it is observed without criticism of them that in the circumstances an understatement of the facts would be more normal than an overstatement. The jurors were neither specifically sworn nor reminded of any previous oath. Whether they spoke under the penalties of perjury presents an interesting question of law, but it would appear unlikely that the jurors considered themselves so bound. At the same time, they may well, however, erroneously, have felt that the subject newspaper stories were within the proscription of the Court's instruction under which they were prohibited from reading articles concerning the case being tried, and a natural reluctance to admit having read the stories would follow. By the same token, however, it can scarcely be doubted that any juror who stated that he read and discussed either article had done so.

For present purposes I assume the weakest case presented by the appellant and consider that only two members of the panel[2] read the article in The Detroit News referring to appellant as "Matthew (Mike the Enforcer) Rubino, reputed Mafia Leader," and deal only with the consequences of their exposure to the article in which that phrase appeared. Since proceeding on that assumption, I would first summarily sweep aside an oral argument presented by the government when this case was heard and apparently adopted by the majority to the effect that Rubino had the burden of moving that these two jurors be replaced by the alternates and that having failed to make such a motion he will not now be heard to complain. Alternates are provided to fill vacancies in a jury box resulting from misadventure, and are not sworn so that the defendant may be required to play Russian Roulette. Rule 24(c), Fed.R. Crim.P.

Assuming, then, that two members of the panel have read the offending material, and further assuming for the moment that the taint is of indelible nature, the question presented is how many rotten apples does it take to spoil the barrel. To hold that possession of prejudicial information by any number less than the panel's total invites endless and obviously futile speculation. For example, should we here speculate as to whether the two readers of The Detroit News were dominant and articulate or meek and quiescent members of the panel? To state such questions is to answer them, and I would hold that if the accused material is in fact prejudicial

---

1. An example of this difficulty may be seen in this question and answer:
   "Q. [W]as Mr. Louisell discussed in the jury room today?
   "A. Not to me, Your Honor."
   In the absence of a clarification, the nonresponsive answer leaves open the question of whether the juror heard a discussion about Mr. Louisell among other jurors. That the trial judge had some reservations in this area is apparent. Prior

to expressing satisfaction as to the jurors' ability to render a fair and impartial verdict, he stated, "You really never know the extent of what the jurors saw or read."

2. The fact that the majority and I differ as to whether one or two had read this article does not alter the principles involved.

its possession by even one member of the panel must be fatal.

Before moving to a consideration of the virulence of the offending statement it is observed that none of the cases dealing with allegedly prejudicial material is in point because the leading Supreme Court opinions in this area deal with cases wherein the publicity was concerned with the case at trial. *See, e. g.,* Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (exposure of the jury to highly publicized and prejudicial accounts and comments concerning the trial); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (extensive television and broadcast coverage of the pretrial hearing and portions of the trial); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (televised interrogation and interview of the accused where he confessed to several crimes), and Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (intense community prejudice and jurors' sentiment of partiality against the accused).

Except in extraordinary circumstances (Sheppard v. Maxwell, *supra*; Shepherd v. Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed.2d 740 (1951)), the trial court has had and has exercised the means of insulating the jurors from tainting publicity, and there remained for adjudication only the issue of the effectiveness of the insulation or the result of such penetration through it as occurred. *See, e. g.,* Silverthorne v. United States, 400 F.2d 627 (9th Cir. 1968); Holmes v. United States, 284 F.2d 716 (4th Cir. 1960); Briggs v. United States, 221 F.2d 636 (6th Cir. 1955); and Marson v. United States, 203 F.2d 904 (6th Cir. 1953). Therein the accusing finger has been pointed either at the trial judge for a failure to provide that insulation or at jurors who have circumvented it. Such is not the situation here, where the tainting material emanated from a source not only beyond the control of the trial court but from a source which would never reasonably fall within the

most cautious judge's contemplation. Thus while these opinions provide much helpful reasoning none is controlling. The majority opinion places emphasis on the fact that "[t]here is no contention that any of this publicity was generated by a representative of the United States." I can see no significance in this circumstance. As Judge Cecil of this Court stated in a generally analogous situation, "Because we are concerned with the prejudicial effect of [the] statement, it is immaterial whether the actions of the prosecutor were intentional or otherwise. The specific question before us is whether the prejudicial effect of this incompetent testimony was cured by the admonition of the judge." United States v. Smith, 403 F. 2d 74, 76 (6th Cir. 1968).

The determination as to whether the material under attack is prejudicial in the present context may best be resolved on the basis of whether its admission into evidence over objection would constitute grounds for a mistrial or for the subsequent vacation or reversal of a judgment entered on a verdict. Thus whether the receipt in evidence of page 1 of The Detroit News of January 21, 1969, would constitute such prejudicial error becomes pertinent. No organization (if that be an acceptable term) today strikes such terror to the American heart as does the Mafia. A current best seller in the field of American fiction depicts its evils, as do both fictional and allegedly factual presentations by national media. Its corruptions are constantly chronicled and its atrocities in every area of unsavory activity are endlessly portrayed in vivid detail. We daily hear and read how the ill-gotten gains of its narcotic traffic, prostitution rings, usury rackets and murders by contract are invested in staggering sums in legitimate enterprises of every nature, frequently placing control in the hands of shadowy arch criminals. These observations are not based on facts that have not come into this record through admissible evidence safeguarded by confrontation and cross-examination of a

witness testifying under oath, but neither did the appellant's characterization as "Matthew (Mike the Enforcer) Rubino, reputed Mafia leader," get into the record that way. I am of the view that had this clearly inadmissible statement been received by the jury in the courtroom, no amount of judicial instruction could have eliminated its prejudicial effect. Similarly, I must conclude that the acquisition of prejudicial material outside the courtroom by at least two members of the jury in the present case requires reversal. I add that while standing alone the knowledge of at least some jurors of Judge Baum's deprecating if not incriminating references to Mr. Louisell probably would not constitute prejudicial error, this circumstance adds support to my conviction that the judgment should be vacated.

I would, however reluctantly, vacate the judgment and remand the cause for retrial.