UNITED STATES of America,
Appellee,

v.

William Michael THAW, Appellant.

No. 9617.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 5, 1965.

Decided Nov. 22, 1965.

William W. Moore (Court-assigned counsel) Fairfax, Va. (Bauknight, Prichard, McCandlish & Williams, Fairfax, Va., on the brief), for appellant.

C. V. Spratley, Jr., U. S. Atty. (Plato Cacheris, First Asst. U. S. Atty., on the brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BOREMAN, Circuit Judges.

SOBELOFF, Circuit Judge.

Appellant Michael William Thaw and an alleged confederate, Donald Hassel, were charged in a three-count indictment with (1) mail fraud, 18 U.S.C.A. § 1341 (1958); (2) inducing a person to travel in interstate commerce as a part of a scheme to defraud, 18 U.S.C.A. § 2314 (1958); and (3) conspiracy to violate the above-mentioned sections. In separate trials both defendants were acquitted of the conspiracy; Thaw was

convicted on both counts (1) and (2), and Hassel on count (2) only. The latter conviction was separately reviewed and affirmed. See Hassel v. United States, 341 F.2d 427 (4th Cir. 1965).

## I. *Sufficiency of the Evidence*

On appeal, Thaw's primary contention is that the evidence showed only a series of business deals that unfortunately failed to bear the hoped-for fruit, not a scheme to defraud. The trial lasted three days, and much of the Government's testimony was denied by appellant. A careful review of all the testimony and exhibits leads us to the conclusion that the jury could have found the following beyond a reasonable doubt:

In May, 1962, the Micronics Corporation of America, which has its principal offices in Philadelphia, employed Thaw as an agent to secure distributors for its products, miniature tools used in the electronics industry. Thaw set himself up for operation in Hampton, Virginia. He placed an advertisement in the Newport News Daily Press, a newspaper with second-class mailing privileges. Harry Nock, a resident of Hampton, answered and, after some investigation of the Philadelphia company named in the advertisement, gave Thaw a $5000 check to "Micronics Corporation of America" and received a contract as a "master distributor" for that firm. Thaw told Nock that the $5000 would be held in escrow to guarantee payment for the tools that were to be delivered to him.

However, instead of arranging for the delivery of tools and catalogues, Thaw suggested formation of a Virginia corporation entirely independent of Philadelphia Micronics, under the name of American *Minitronics* Corporation. Nock agreed, and Thaw obtained a charter from the Virginia Corporation Commission, naming Nock President and himself Secretary-Treasurer and responsible agent.

Thaw now told Nock that for an additional $5000 the Virginia corporation could be given the Micronics sales franchise for the entire Southeastern United States, from northern Maryland to Florida, and become entitled to commissions on all sales by distributors in that area. After some initial hesitation, which Hassel helped to dispel, Nock gave Thaw a second $5000 check, also made out to Micronics, the Philadelphia corporation.

A brief résumé of the short but turbulent history of the funds Nock turned over to Thaw shows that Nock's worries were not unfounded. When Thaw first came to Hampton in May, he established a bank account in the name of "Micronics Corporation of America of Hampton, Virginia," the name of the Philadelphia company with the added words "of Hampton, Virginia." The account was subject to Thaw's order. His opening deposit was $400 of his own money on May 28. Three days later Thaw caused $3500 of Nock's first $5000 check to be applied to that account. Thaw received the remaining $1500 in cash. In the next ten days, Thaw withdrew all but approximately $100 from the account, mostly by checks payable to "cash," and the remainder by checks to his confederate, Hassel, checks to pay his motel bill, and an $800 check to repay an unrelated personal debt.

On June 14, Thaw deposited Nock's second $5000 check, and on the same day withdrew $3400. By July 7, Thaw had dissipated the entire $10,000. Nock never received any tools or catalogues, and recovered none of this money. When interrogated at trial as to how he had disposed of all of this cash, Thaw admitted that, among other things, he had used the funds to pay his apartment rent in Philadelphia and to pay business debts unrelated to Micronics or Minitronics. The president of Micronics, the Philadelphia company, made clear that his company received "not one penny" of the proceeds from the two $5000 checks drawn to its order and deposited in the Hampton bank account.

Meanwhile, as soon as Virginia Minitronics had been chartered, Thaw laid plans for the sale of more distributorships. He hired a secretary who at Thaw's direction mailed advertisements

to a number of newspapers in Maryland, Washington, and Virginia, all of which had second-class mailing privileges. These advertisements outlined the great potential for the sale of miniature tools, declared that a $5000 deposit would insure a qualified applicant a "guaranteed" deal, and directed interested persons to communicate with Harry Nock at Virginia Minitronics in Hampton. At Thaw's direction, the secretary also prepared several letters with Nock's name typed in for signature. When Thaw directed her to sign Nock's name, she refused, and they were mailed without signature. Nock testified that he had not authorized anyone to sign his name.

Others also responded to the advertisements, travelling to the Marriott Motel in Virginia from other states and the District of Columbia to meet Thaw. We need not follow through on Thaw's conferences with those who for one reason or another were not induced to part with money. It was shown, however, that the advertisements continued to appear at Thaw's instance. Henry Goldfine, of Silver Spring, Maryland, responded to a Washington Star advertisement and travelled from his home to Virginia, where he met Thaw at the Marriott. Thaw offered him the distributorship for the Washington area, but dropped the price to $2500.

Goldfine agreed to this deal, and on July 23, 1962, was given a contract by Thaw as a distributor for Virginia Minitronics. Curiously, though, the $2500 check which he gave Thaw as a "deposit" for the Virginia Minitronics dealership was drawn to the order of Micronics of Philadelphia, with which Goldfine had no contractual relationship. The reason became clear when Thaw immediately deposited the Goldfine check in the account in Hampton, the same account he had earlier used to gain access to Harry Nock's $10,000. This time, however, Goldfine took the precaution of checking the names and phone numbers of customer accounts which Thaw had represented to exist in the Washington area. Finding these so-called accounts to be either answering services or unknown at the addresses Thaw gave, Goldfine stopped payment on the check before it cleared his bank, four days after giving it to Thaw.

On the same day that Thaw was selling the franchise for the Metropolitan Washington area to Goldfine, and before the latter stopped payment on his check, Thaw sold the very same area to another potential "exclusive distributor," George T. Shafley, of Clinton, Maryland. Shafley had answered a Virginia Minitronics advertisement in the Washington Evening Star by writing to Harry Nock in Hampton. Soon afterward, he received a telephone call from a "Mr. Kagen," [1] which led him to travel from his home in Maryland to the Marriott in Virginia to meet Thaw. Although the advertisement to which Shafley responded stated that the franchise deposit would be $500, Thaw immediately declared that the amount specified in the advertisement was in error, and insisted that $5000 was the intended figure. See Hassel v. United States, supra. After further discussion, however, Thaw persuaded Shafley to purchase the "exclusive" Washington dealership for $1000. Shafley paid Thaw this amount by a check drawn by Shafley's daughter which had been endorsed in blank. Thaw cashed and retained the proceeds of this check.

Thaw had not finished with Shafley. In about two weeks he approached him again, this time to offer Shafley the entire Southeastern zone distributorship, explaining that Harry Nock was unable to handle it due to his age and illness, an offer and explanation of which Harry Nock testified he had no knowledge whatever. This was the same area which Virginia Minitronics had been set up to service, for which Nock had paid the additional $5000, and for which Virginia Minitronics had received a distributorship contract from Micronics in Philadelphia. Thaw persuaded Shafley to put

1. Goldfine testified that one of the nonexistent account names given him by Thaw was "Kagen Ultrasonic Machine."

584

up an additional $1200, which, added to the $1000 previously paid Thaw, would entitle Shafley to the franchise for the larger area. He gave Thaw a $1200 check on August 15, endorsed in blank, and Thaw gave him as "security" a 30-day post-dated check drawn on the Hampton account of Virginia Minitronics. When Shafley, failing to receive catalogues or tools, later attempted to cash the "security" check, it was returned marked "Not Sufficient Funds."

Having installed a new Southeastern zone manager in place of Harry Nock, Thaw turned his attention to John Rutherford of Falls Church, Virginia. Rutherford had answered a Wall Street Journal advertisement for distributors placed by Micronics of Philadelphia. The Philadelphia officials, ignorant at this time of the various distributorships which had already been sold, referred Rutherford to Thaw. Thaw quickly talked him into putting up a $1500 "deposit" for a Micronics distributorship in the Metropolitan Washington area. On August 17, Thaw took Shafley with him to meet Rutherford in Falls Church. Thaw gave Rutherford a contract as a Micronics distributor, and received a check endorsed by Rutherford to the order of Micronics Corporation of America. Rutherford testified that at the time he endorsed the check, it contained no other endorsement, but as introduced at Thaw's trial, the additional words "and/or [to the order of] George T. Shafley" had been inserted.

Thaw prevailed on Shafley to have the check cashed, which Shafley did. He handed Thaw the $1500 in cash, of which Thaw returned $375 as Shafley's share as Southeastern zone manager. None of the $1175 retained by Thaw was accounted for to Micronics of Philadelphia.

■ This narrative presents the simple question, could the jury find beyond a reasonable doubt that Thaw had "devised or [was] intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" when, through advertisements in the various papers, he induced Shafley and others to travel in interstate commerce, and when he used newspapers with mailing privileges to sell these various distributorships? Our answer must be in the affirmative. All of the money received by Thaw from his victims was applied to his own uses, none to the purposes represented by him. The jury could well conclude that Thaw's scheme was to sell as many "exclusive" distributorships as possible in the Washington area, using Nock, Shafley and other victims as unknowing cat's-paws to cover his swindles.

## II. *Use of the Mails*

■ Appellant argues that it was not shown that the mails were used in the perpetration of the fraud. There is first the evidence that the newspapers in which the advertisements were placed had second-class mailing privileges. And it is clear from the testimony of the secretary hired by Thaw for Virginia Minitronics that the letters mailed out over Nock's name (but not his signature) were prepared and mailed at Thaw's direction. This direct testimony of the use of the mails at defendant's direction was sufficient. Compare United States v. Ellicott, 336 F.2d 868 (4th Cir. 1964).

## III. *Failure to Instruct on Puffing*

■ During the voir dire examination, Thaw's counsel interrogated several prospective jurors on their understanding of the distinction between fraud and mere "puffing" in a business promotion. The District Judge terminated this line of questioning, stating out of the jury's presence that he would instruct on the distinction at the close of the evidence. Defense counsel, however, did not request such a charge either at the close of the testimony or after the court's charge when the Judge asked if either party desired additional instructions. Thaw argues that a request for such instruction was not necessary, as the court's failure to instruct on an essential element of the offense was clearly prejudicial. We have been cited to only one case as support for petitioner on this point, United States v. Levy, 153 F.2d 995 (3d Cir.

1946). There, a defendant was charged with selling whiskey at prices above those set forth in the Emergency Price Control Regulations. The trial court failed to instruct on the applicable statutes or explain the nature of the offense charged. The conviction was reversed on the ground that the jury was given no basis for imputing illegality to the conduct involved. Here, on the other hand, the illegality of the charged conduct was evident to the jury. The trial court specifically instructed on the elements of the crime, and told the jury that one essential element of the offense was an attempt to defraud.

 Where there is substantial ground to fear that prejudice to the defendant may have resulted from failure to instruct fully, an appellate court may, in the interest of justice, consider a point not raised below. E. g., Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926); Yoffe v. United States, 153 F.2d 570, 576 (1st Cir. 1946). But there is no ground to suspect prejudice in this instance. The evidence for both the Government and the defendant was designed to characterize the activities of Thaw as either fraudulent or nonfraudulent. In his direct testimony, Thaw went to great lengths to portray his dealings as ordinary business conduct, and his counsel's closing argument attempted to characterize them in the same light. Preferably, the Judge having stated that he would charge specifically on "puffing" should have done so. But it is plain that the court's statement was overlooked not only by the Judge, but also by counsel, because the substance of such a charge was covered in the instructions given. It does not appear that the issue the jury was called upon to decide was obscured or that any argument favorable to the defendant was cut off or weakened.

### IV. "Fictitious Name Corporation" Instruction

Finally, Thaw complains of the trial court's failure to clarify the meaning of a "fictitious name corporation"

under Virginia law, suggesting that the use of this term during the trial implied that Virginia Minitronics itself was not a legally constituted corporation. Actually, the trial court in its instructions stated that whether Virginia Minitronics was considered *"de jure"* or *"de facto"* made no difference, since the Government charged that it had been *used* as part of a fraudulent scheme. We think this instruction was, in the context of all the evidence, plainly sufficient.

The court expresses its appreciation to appointed counsel for the diligence and ingenuity with which he has briefed and argued this appeal.

The judgment is

Affirmed.