**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joseph VAN DYKE, III,**
**Defendant-Appellant.**

**No. 79–5020.**

United States Court of Appeals,
Sixth Circuit.

Argued June 21, 1979.

Decided Sept. 13, 1979.

Richard J. Marco (Court appointed CJA), Cleveland, Ohio, for defendant-appellant.

.James R. Williams, U. S. Atty., Ralph E. Cascarilla, Cleveland, Ohio, for plaintiff-appellee.

Before WEICK and MERRITT, Circuit Judges and PECK, Senior Circuit Judge.

WEICK, Circuit Judge.

Defendant-Appellant Van Dyke was indicted by the Federal Grand Jury in the Northern District of Ohio, Eastern Division for mail fraud in violation of 18 U.S.C. § 1341. The indictment contained 29 counts. During his trial by jury which lasted for nearly two months the Government dismissed two counts of the indictment for technical reasons and the jury found him guilty of three of the remaining 27 counts. He was sentenced pursuant to 18 U.S.C. § 4205(b)(2) to four years imprisonment on each count, to be served concurrently. In his appeal, he raises the following issues:

1. Violation of his constitutional right to a speedy trial.

2. Deprivation of his constitutional right to a fair trial by the manner and method in which his trial was conducted by the District Court.

3. The District Court erred in admitting the testimony of his agents who testified as to the false and fraudulent representations.

4. The District Court erred in denying his motion for a mistrial where certain jurors had read a newspaper advertisement of a former employee who had testified as a witness.

As we will point out, these contentions are without merit and we affirm.

## I

### Facts

Appellant was the chief executive officer of Rings 'N Things, a company that wholesaled costume jewelry. Rings 'N Things was a subsidiary of Atlantic Southern Company, a holding company owned and controlled by Appellant. Appellant and his wife were on the Board of Directors of Rings 'N Things.

In addition to selling jewelry, Rings 'N Things principally was engaged in selling distributorships to investors. A distributorship was portrayed as an opportunity for individuals with a limited amount of cash to go into business for themselves and earn large profits for only part-time work. Distributors were to place displays of good quality jewelry in drug stores, newsstands, beauty parlors and other retail establishments on a consignment basis. The distributor's duties were to collect proceeds of sales from merchants who sold the jewelry and to keep the displays stocked with saleable jewelry bought from Rings 'N Things. For an investment of $4925.00 to $6495.00 an investor-distributor was promised 320 dozen pieces of jewelry of good quality, display stands, twenty "pre-sold" retail sales locations wherein merchants had already agreed to accept Rings 'N Things displays on a consignment basis, a unique and proven successful marketing strategy, distribution rights to a specific geographic area, placement of the displays in the twenty locations by a "fashion consultant" experienced in Rings 'N Things successful marketing strategy, and a guarantee that if the investor was dissatisfied after one year, the company would repurchase the distributorship for an amount substantially equal to the initial investment less the investor's gross sales. The investment in a Rings 'N Things distributorship was portrayed as risk free.

In fact, these representations or promises were in part or wholly false. Few of the investors received 320 dozen pieces of jewelry. Of those who did receive jewelry, most received a small shipment of several dozen pieces. In fairness, some of these partial shipments contained good quality jewelry as promised, but often in these partial shipments the jewelry was unpacked, disorganized, or broken. Many investors received no jewelry or display racks at all. Contrary to representations, Rings 'N Things' distributorship method of sales was not unique, but had been substantially acquired by Appellant while he was previously employed as a distributorship salesman of costume jewelry at Phase III, of Southfield, Michigan. Only a handful of distributors ever received the twenty pre-sold locations that were promised; many received none at all. Similarly, very few of the distributors received promised assistance and expertise from fashion consultants. Contrary to representations, distributors often did not receive the exclusive right to sell in a given geographic area. Selling territories often overlapped without the consent of the persons involved, and in one case at least more distributorships were sold in a small town than the population could possibly accommodate, which was with the Appellant's full knowledge. Although several distributors received their money back, as promised, after threatening publicity-generating lawsuits, the vast majority of distributors have not received their money back.

Appellant had developed a "sales pitch" and a brochure used in sales presentations. Appellant sold the first of the distributorships himself. Lester Kean, one of the first individuals to purchase a distributorship, testified that Appellant used stationery indicating that Rings 'N Things had offices in cities around the United States and that Appellant represented Rings 'N Things as a nationwide company that was very successful. At that time, of course, Rings 'N Things had no such offices, no such nationwide scope, and no such financial strength. Appellant trained salesmen for his organization and trained Richard Neiswonger, his national sales manager, to use his sales pitch. Neiswonger, who among other things was a former magician, trained other salesmen who were given a commission of $800.00 to $900.00 for each distributorship they sold. Salesmen were instructed to adhere to the sales presentation as supplemented by reading through the sales brochure with the potential investor.

An investor would read an advertisement in the business section of a local newspaper which advertisement would be entitled variously, "Local distributor can make monthly gross revenue of up to $3,456," "Local distributor has monthly revenues of $3,456," or "Local distributor has monthly gross revenue of $3,456 part time with a net profit of 35 percent ($1,206.60) for 7 to 10 hours work weekly. Assume business responsibilities within four to six weeks," whereas no such proven profit record existed. After reading the advertisement, an investor would call a toll free number and ask for Tom Buchanon, an assumed name. An appointment with a salesperson would be arranged. The salesperson displayed good quality merchandise at this meeting and worked through the sales brochure. The potential investor was given a "negative sell", i. e. the sales effort was directed at inducing the individual into offering to buy a distributorship. The individual was often asked to sign a document indicating that he would not disclose the information offered at the sales presentation. Few sales were closed immediately. In most instances the investor contacted the salesman several days later and agreed to buy a distributorship. After mailing a certified check and signed distributorship contract to Rings 'N Things in Cleveland, the person was notified by the company that his application for a distributorship was accepted pending final acceptance by the board of directors of the corporation, which included Appellant and his wife.

Although minor variations existed in the sales presentations described at trial by six salesmen, the testimony viewed in its entirety reveals that the sales presentations were strikingly similar in content. Several misrepresentations and falsehoods were

stated to induce the sale. The company was portrayed as an established, well-financed and experienced company, whereas in fact the company was less than two years old and was poorly financed. Appellant himself had little personal knowledge of the costume jewelry business. The company was portrayed as seeking to appoint select persons as distributors. Investors were told that not everyone would qualify, whereas the evidence indicates that no application for a distributorship was rejected and no such discrimination in the selection of potential distributors took place. The marketing method employed by the company was portrayed as a proven success, whereas in fact this method was unproven by Appellant and no company experience, studies, or statistics existed to prove the claims of consistent success. Average daily sales were represented to be four sales per day for the company nationwide in early presentations, six to eight in later presentations, whereas actual sales appeared to be often one piece of jewelry per day or less for the distributors who received merchandise. At one salesman training session conducted by Neiswonger, assisted by Appellant, the salesmen were told that some distributors earned as high as $100,000.00 per year and that average sales per day for the company were six to eight sales, whereas no such profits or sales figures existed in fact.

To induce the sale of a distributorship, investors were given the names of fellow investors to call to discuss the success of their distributorships. Early in the life of Appellant's enterprise actual distributors were used who gave glowing generalities on the success of their distributorships for which praise they were paid by Appellant. When these references began giving bad recommendations or began refusing to answer calls, Appellant hired "singers" who were paid to falsely extoll the success of Appellant's distributorships.

In late 1975 Appellant was repeatedly warned by employees that his organization was incapable of handling the demands of outstanding distributorship contracts. Appellant nevertheless demanded that 200 new distributorships be sold in January, 1976, alone. In early 1976 little or no merchandise was bought to honor Appellant's company's contractual obligations. Nevertheless, as of April 30, 1976, Appellant's company at his direction had spent approximately $1,230,000.00 of $1,500,000.00 raised from the sale of distributorships. As of that date, only approximately $10,000 in jewelry reorders had been placed. No merchandise was received or ordered from jewelry suppliers after mid-July, 1976, yet Appellant inexorably demanded the sale of more distributorships until his company was forced into bankruptcy in January, 1977. Many distributors complained by telephone and letter, however, little or no results were obtained. Invariably callers were told that Appellant was a busy man and could not speak with them.

While the lawful demands of distributors were left unattended Appellant spent considerable sums for his personal benefit. Among other things, Appellant purchased a $115,000.00 seaside home on Jekyll Island, Georgia, using company funds partially for a down payment and for the purchase of furniture. He arranged for the company to pay his first wife $500 per month for six months in alimony payments and listed her on the company payroll as a fashion consultant, whereas in fact she provided no services whatsoever to the company. He bought his second wife an $8,000.00 diamond necklace. While distributors were receiving piecemeal portions of jewelry because of a lack of warehoused merchandise, Appellant in addition to other paid expenses and benefits, including spending money, drew an official salary of $10,000.00 per month in 1976. At company expense Appellant rented, furnished and decorated at a cost of approximately $15,000.00 a three bedroom high rise apartment suite for his personal use which overlooked Lake Erie. He purchased approximately $11,000.00 in stereo equipment, the great majority of which was installed in Appellant's apartment. At company expense he bought a Cadillac Seville and rented another Cadillac. At company expense he bought a boat in Florida for at least $29,500.00. He paid in

excess of $5700.00 in company funds to Golden Isles Aviation, a commuter airline, for weekend commuting from Jacksonville, Florida, to his personal residence on Jekyll Island, which sum does not include regularly scheduled commercial air fare between Jacksonville and Cleveland. He later leased a private plane at $3500.00 per month for two months which he used at his convenience. In September and October, 1976, near the end of the short twenty month life of Appellant's organization, Appellant spent $7000.00 for a trip for his wife, himself, and another couple to the Cayman Islands. Though Appellant asserts that this trip was for business purposes Appellant himself described it as a vacation on company internal records.

Appellant's costume jewelry distribution business collected in excess of $3.5 million during a 20 month period from over 500 investors in distributorships in at least 40 states by the use of the mails and by various false and fraudulent statements contained in a "sales pitch" by its agents and sales brochure conceived by Appellant. While Appellant's business was floundering shortly before its involuntary bankruptcy, Appellant used company funds for a multitude of personal expenses.

At the trial which lasted nearly two months the Government called more than 70 witnesses and presented over 300 documentary exhibits. It is significant that the conviction on three counts of the indictment all involved sales of distributorships in December 1976 which was the last full month of Rings 'N Things business operation and on the eve of its bankruptcy which occurred in January 1977, which distributorships were at the time worthless.

In reviewing the evidence, we are mindful that the scheme to defraud element required under § 1341 is not defined according to a technical standard. The standard is a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973), *quoting Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958). It is not necessary that the scheme be fraudulent on its face but the scheme must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. *United States v. New South Farm & Home Co.*, 241 U.S. 64, 71, 36 S.Ct. 505, 60 L.Ed. 890 (1916); *Bruce, supra*, at 1229; *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978).[1] The question of fraudulent intent under § 1341 is for the jury. *United States v. Hopkins*, 357 F.2d 14, 18 (6th Cir. 1966). Viewing the evidence in the light most favorable to the Government, as we must, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), *Ross v. United States*, 197 F.2d 660, 665 (6th Cir. 1952), we believe that there is substantial evidence from which the jury could find fraudulent intent.

The court denied defendant's motion for judgment of acquittal made at the close of the Government's evidence. The defendant did not renew the motion at the close of all of the evidence. This constituted a waiver of his objection to the denial of his motion for judgment of acquittal on that ground. *United States v. Maffei*, 450 F.2d 928 (6th Cir. 1971), *cert. denied*, 406 U.S. 938, 92 S.Ct. 1789, 32 L.Ed.2d 138 (1972).

---

1. For similar though not identical mail fraud proceedings see *United States v. Krohn*, 573 F.2d 1382 (10th Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978); *United States v. Smith*, 561 F.2d 8 (6th Cir.) *cert. denied*, 434 U.S. 958, 98 S.Ct. 487, 54 L.Ed.2d 317 (1977); *United States v. Serlin*, 538 F.2d 737 (7th Cir. 1976); *United States v. Cohen*, 516 F.2d 1358 (8th Cir. 1975); *Hildebrand v. United States*, 506 F.2d 406 (5th Cir.), *cert. denied*, 421 U.S. 968, 95 S.Ct. 1961, 44 L.Ed.2d 457 (1975); *United States v. Uhrig*, 443 F.2d 239 (7th Cir.), *cert. denied*, 404 U.S. 832 (1971); *Blachly v. United States*, 380 F.2d 665 (5th Cir. 1967); *Anderson v. United States*, 369 F.2d 11 (8th Cir. 1966), *cert. denied*, 386 U.S. 976, 87 S.Ct. 1171, 18 L.Ed.2d 136 (1967); *Fabian v. United States*, 358 F.2d 187 (8th Cir.), *cert. denied*, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966); *United States v. Thaw*, 353 F.2d 581 (4th Cir. 1965).

## II

Appellant next argues that he was denied his sixth amendment right to a speedy trial. Pre-trial proceedings were conducted 214 days after Appellant's arraignment. The trial commenced 362 days after arraignment.

Although this delay was in excess of that permitted under the Northern District's interim plan for the prompt disposition of criminal cases, this Circuit has held that this fact alone does not mandate reversal. *United States v. Callahan*, 579 F.2d 398 (6th Cir. 1978); *United States v. Lee*, 575 F.2d 1184 (6th Cir. 1978). Four factors should be considered in determining whether a particular defendant has been deprived of his right to a speedy trial: the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The settled law of this Circuit is that Appellant must show that the prosecutorial delay was intentional, and as a result the defendant suffered actual prejudice. *United States v. Alred*, 513 F.2d 330, 332 (6th Cir. 1975); *United States v. Giacalone*, 477 F.2d 1273, 1276 (6th Cir. 1973). Unintentional delays caused by overcrowded court dockets or understaffed prosecutors are among the factors to be weighed less heavily than intentional delay, calculated to hamper the defendant. *Strunk v. United States*, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973). Length of delay alone does not establish prejudice. *See, e. g., United States v. Sandy, et al.*, 605 F.2d 210, No. 77–5367, etc. (6th Cir. July 27, 1979) (thirty five month delay between indictment and trial not sufficient for reversal); *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978) (twenty three month delay between indictment and trial not sufficient for reversal); *United States v. Lemmons*, 527 F.2d 662 (6th Cir. 1975) (eleventh month delay); *Short v. Cardwell*, 444 F.2d 1368 (6th Cir. 1971) (over four year delay). The record is devoid of any evidence of prejudice to Appellant or intentional delay by the prosecution in the preparation of this pro-

tracted case. Appellant argues that he suffered emotional strain while awaiting trial and that he was unable to find employment, however some degree of emotional strain exists in every criminal proceeding. *Arrant v. Wainwright*, 468 F.2d 677, 682 (5th Cir. 1972). Appellant submits that the strain in the instant case was unusual because of great publicity, fanfare, and "bad press" surrounding his indictment, however we do not believe that this strain, though regrettable, requires reversal of Appellant's conviction.

## III

Although Appellant cites no authority for support, Appellant's next argument is that the District Court scheduled the trial so poorly that Appellant was denied a fair trial. Prior to trial in its Memorandum Opinion and Order denying Appellant's Motion to Dismiss the District Court stated:

> It appears that the Defendant would suffer considerable harm if he were forced to defend a suit in which testimony was continually interrupted for days at a time because of the necessity for the Court to attend to other urgent matters. The business of this Court in the past year has been such that the probability of that happening could not be ignored. Therefore, it seemed wise to postpone beginning the trial until it could be conducted with some continuity.

In spite of this pronouncement, the District Court nevertheless proceeded to schedule Appellant's trial on twenty three days over a fifty five day period. Thirteen of these days were half morning sessions; "full" days were relatively brief morning and afternoon sessions separated by a two hour lunch. In the midst of trial, with the consent of the parties, the District Judge for ten days attended a judicial conference in Williamsburg, Virginia. Court was also recessed for a three day period and for five individual days sprinkled throughout the course of the trial. The District Court indicated that these delays were necessary because of administrative duties incidental to

the District Court's position as Chief District Judge of the Northern District of Ohio and the District Court's preoccupation with the Cleveland school desegregation case. Appellant submits that the delays, which occurred primarily during the prosecution's lengthy presentation, may have caused the jurors to mull over or give undue consideration to the Government's position, or, alternatively, that the jurors may have forgotten testimony favorable to Appellant raised on cross examination or inadvertently raised on direct examination.

Moreover, the Appellant at oral argument complained about the District Court's conduct. In particular, after indicating to the jury by word and deed during the trial that he was pressed for time, the District Court announced just prior to the presentation of the Defendant's case that

> THE COURT: I believe that Friday I will be unable to go forward in the afternoon. If I am not completely tied up in my chambers and it is a nice day, I'm going to take the afternoon off and go fishing.
>
> (Laughter)
>
> DEFENSE COUNSEL: I saw you on television, Judge.
>
> A JUROR: I'll go with you.

A District Court has wide discretion in the scheduling of a trial which should not be disturbed in the absence of manifest abuse which does not exist here. *Carter v. United States*, 373 F.2d 911, 914 (9th Cir. 1957); *Kansas City Star Co. v. United States*, 240 F.2d 643, 651 (8th Cir. 1957). We note that parties appear to more often object to the denial of a recess as an abuse of discretion by the District Court than to a stretching of the trial over a period of time by the District Court. *See* Annot., 21 A.L. R.Fed. 948 (1974). This trial was not hurried and encumbered by arbitrary time limits. *See United States v. Diharce-Estrada*, 526 F.2d 637 (5th Cir. 1976). We believe that this trial was not well scheduled. The District Court should have arranged his schedule so that Appellant's trial could have been held with more sustained continuity. We do not believe, however, that what he

did constituted manifest abuse which requires us to reverse Appellant's conviction. The number of interruptions alone does not establish actual prejudice. Aside from inconvenience shared by both parties in order to comply with the Court's schedule, Appellant has failed to demonstrate any actual prejudice that could have resulted to him from the scheduling. The record shows that defense counsel employed extensive cross examination of witnesses including frequent recross examination. Counsel for both sides were commendably well prepared for each session. If the jury did forget testimony, and we do not so conclude from the record, it is equally probable that the jury forgot evidence favorable to the prosecution, whose case in chief was largely interrupted, as it is probable that the jury forgot evidence favorable to Appellant.

Viewing the record as a whole we conclude that the District Court conducted the trial evenhandedly. In the face of substantial evidence from which the jury could have found fraudulent intent, the jury found Appellant guilty of only counts four, five and seventeen which were based upon distributorship sales ordered by Appellant in December, 1976, well after the point in time when it was totally obvious that Appellant's company had neither the merchandise nor the personnel to fulfill its contractual obligations. Accordingly, we find no prejudicial error resulting from the scheduling and conducting of the trial.

## IV

Appellant contends that the District Court erred in admitting over Appellant's objection testimony by victims of the fraud. He submits that this testimony was hearsay because there was insufficient evidence that the salesmen acted as agents of Appellant's company, or, alternatively, that if the salesmen were agents, that there was insufficient evidence of authorization or ratification by Appellant of the false statements made by the salesmen. Appellant does not dispute that false statements were made; he disputes that he instructed the agents to make untrue or misleading statements. He

further submits that he was prejudiced because the Government called only six of the sixteen salesmen named in the indictment to testify on the content of the sales presentation. Actually the defendant may have been benefited instead of prejudiced that only six of the sixteen salesmen were called to testify against him. Had all the salesmen testified against him he might have been convicted on all 27 counts of the indictment instead of his acquittal on 24 counts.

The District Court admitted the testimony of the company salesmen under Fed.R. Evid. 801(d)(2)(C) or (D) which read in pertinent part as follows:

> (d) Statements which are not hearsay. A statement is not hearsay if—
>
> \*    \*    \*    \*    \*    \*
>
> (2) Admission by party-opponent. The statement is offered against a party and is (A) his own statement, on either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) *a statement by a person authorized by him to make a statement concerning the subject, or* (D) *a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship.* [Emphasis added.]

The evidence was admitted on condition that the Assistant United States Attorney would establish agency, authorization, or ratification.

▮▮▮▮ We do not believe that the District Court erred in admitting the testimony of the company salesmen or the testimony of the victims as to the content of the sales presentations. *See United States v. Krohn*, 573 F.2d 1382, 1386 (10th Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978); *Fabian v. United States*, 358 F.2d 187 (8th Cir.), *cert. denied*, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966). The Assistant United States Attorney introduced sufficient evidence of agency, authorization or ratification. For example, Defendant wrote both the original and revised sales

brochures which were an integral part of the scheme. The Defendant practiced his sales technique on early investors, then trained his national sales manager, Neiswonger, and joined Neiswonger in designing and implementing a training program for other salesmen. Salesmen testified that they were told to follow the sales presentation given to them and that the presentation was very effective in procuring sales. Neiswonger testified that he was trained by Appellant. Miller, the salesman named in two of the counts upon which Appellant was convicted, testified that he was trained by Neiswonger assisted by Appellant. Miller and the other salesmen were paid commissions for their work for the company.

The evidence indicates that Appellant dominated Rings 'N Things throughout its short lifespan. Appellant received all checks for distributorships from investors, ordered all merchandise from suppliers, hired and frequently fired all important personnel, and, with the exception perhaps of several payroll checks for which a signature stamp was apparently used by Appellant's personal secretary, Appellant signed all checks drawn on corporate accounts.

There is evidence that Appellant impliedly ratified the acts of his agents. Appellant designed the contract of sale in issue and signed every contract secured by the salesmen. He accepted the purchase price for distributorships with knowledge that he would not be able to fulfill the terms of the contract.

▮▮▮▮ Count five was based upon a sales presentation by salesman Tabor who did not testify at trial. It is not necessary, however, for all of the salesmen named in the indictment to testify if a consistent pattern of sales presentation has been established. The testimony of the victim in count five, Chiostri, established that the sales presentation underlying count five was substantially the same as the other sales presentations presented at trial.

## V

▮▮▮▮ Appellant finally argues that he should receive a new trial because one juror

brought a newspaper ad concerning Richard Neiswonger into the jury room. The ad characterized Neiswonger as an "expert" in the franchise business and advertised that his services were available. The ad was brought to the attention of the District Court by the prosecution. The District Court promptly polled the jurors on whether they had read the article in question. Three jurors indicated that they had read the ad, eight more indicated that they saw it but had not read it. The District Court instructed the jury to disregard this ad and instructed them that the ad was not evidence.

In considering the effect of such extra-judicial material on the jury the District Court has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Each case must turn on its special facts. *Marshall v. United States*, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *United States v. Rubino*, 431 F.2d 284, 288 (6th Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 872, 27 L.Ed.2d 808 (1971).

The jury had reported that they were deadlocked; the jury returned to the jury room for further deliberations and viewed the advertisement in the jury room. The District Court instructed the jury regarding the use of the ad as hereinbefore described and gave the Allen charge at the request of defense counsel. This was a most unusual request to be made on behalf of defendant. The verdict was returned the following afternoon after three and one half days of deliberation. We do not believe, however, that a new trial is necessary because of the presence of this ad in the jury room. There has been no showing of prejudice flowing from the ad's presence. The ad concerned only Neiswonger, not Appellant, or Appellant's counsel. The ad described Neiswonger in complimentary albeit self-serving terms as an "expert" in franchising which could tend to legitimate Appellant's enterprise in the eyes of the jury. The advertisement does not examine or comment upon the nature of any defenses raised at trial by the defendant, nor does it speculate as to the guilt or innocence of the defend-

ant, or recount facts or proceedings occurring during the trial. At best it is a tangential reference to only one witness, though a noteworthy one, of over seventy witnesses called at trial by the prosecution.

The judgment of the District Court is affirmed.