811 F.2d 608
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Melvin MORTON, Defendant-Appellant.
 No. 85-3659.
 United States Court of Appeals, Sixth Circuit.
 Dec. 23, 1986.
 
 Before WELLFORD and GUY, Circuit Judges, and PECK, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 The defendant, Morton, was convicted of the following charges on May 22, 1985, by a jury in the United States District Court for the Southern District of Ohio:
 
 
 2
 Count 1 21 U.S.C. Sec. 846--Conspiracy to possess with intent to distribute and to distribute cocaine
 
 
 3
 Counts 2-5 21 U.S.C. Sec. 841(a)(1)--Possession with intent to distribute and distribution of cocaine
 
 
 4
 Count 6 21 U.S.C. Sec. 844--Possession of marihuana and cocaine
 
 
 5
 Co-defendant Richard "Dickie" Hollingshead was also convicted on five counts, but he is not involved in this appeal. Morton appeals from his convictions on Counts 1-5 on the grounds of insufficient evidence. He does not raise any issue with respect to Count 6.
 
 
 6
 In June, 1984, the Federal Drug Task Force in Cincinnati, Ohio, began an investigation into cocaine trafficking in and around Ken's Tavern and the A-1 Car Wash in Cincinnati, Ohio. Leon Baker, an agent working with the Task Force during the investigation, assumed the undercover identity of "Ike," a businessman from Louisville who was interested in purchasing cocaine. An unidentified informant assisted him in the investigation. The conspiracy and distribution charges resulted from four drug sales that took place in June, 1984; the possession charge arose from Morton's arrest in January, 1985.
 
 I. June 6, 1984: First Sale
 
 7
 Going into the investigation, Baker had information that "Dickie" and Melvin Morton were distributing cocaine. On June 6, 1984, Baker, acting as "Ike," was introduced to "Dickie." At trial, Baker identified Melvin Morton's co-defendant, Richard Hollingshead, as "Dickie." Baker first met Dickie on Walters Street in Cincinnati. Dickie told Baker that his cocaine supplier had been there earlier, and that he would recontact his supplier in order to get one ounce of cocaine for Baker.
 
 
 8
 While Baker was driving Dickie around the area, Dickie saw a silver Buick Electra 225 automobile and told Baker that his cocaine source was driving the Electra. At trial, Baker identified Morton as the driver of the Electra. The license plate on the Electra was registered to Morton, and Morton admitted at trial that he was driving the Electra in the area at that time. Dickie, after attracting Morton's attention, told Baker to follow the Electra. Morton then drove directly to Dickie's home on Walters Street, where he parked the Electra. Dickie and Morton had a conversation outside of Baker's hearing.
 
 
 9
 Dickie returned and told Baker that it would be 1 1/2 hours before the ounce cocaine transaction would take place. Baker left Dickie and Morton; an hour later he returned. Dickie got into Baker's car and stated that he wanted to go to his cocaine supplier's girlfriend's house to see if his supplier was there. While travelling to the girlfriend's house, Dickie spotted Morton in the Electra and told Baker to stop. Dickie and Morton had a conversation in Morton's car although, again, Baker could not hear what was said. Dickie returned to Baker's car and said that his supplier had the ounce of cocaine but wanted Baker to give Dickie the money first. Baker refused, said he would not turn over the money until he got the cocaine, and told Dickie he wanted to meet his supplier. Dickie went back to the Electra and had another conversation with Morton which Baker could not overhear. Dickie returned and said that Baker should meet him in ten minutes at a nearby park but that his supplier did not want to meet him personally. Baker showed Dickie the $2000 for the cocaine and Dickie returned to defendant's Electra. Dickie left with Morton.
 
 
 10
 About ten minutes later, after contacting his surveillance team, Baker went to the park as directed. Dickie appeared alone on foot and got into Baker's car. At Dickie's direction, Baker again drove to Dickie's residence on Walters Street, parked, and gave Dickie $2000 for a bag of white powder containing 26.43 grams of cocaine of 59% purity. DEA Special Agent Richard Stuart surveilled the June 6, 1984, transaction and also identified Morton as the driver of the Electra.
 
 II. June 19, 1984: Second and Third Sales
 
 11
 On June 19, 1984, Baker again met Dickie on Walters Street to buy another ounce of cocaine. Dickie told Baker that everything was set for the sale of the ounce of cocaine from the same supplier in the Electra who had provided the ounce of cocaine on June 6. Following Dickie's instructions, Baker drove to the 1400 block of Locust Street, where Dickie said his supplier's girlfriend lived. Baker and another task force agent saw Morton's Electra parked in that block at this time. Dickie said he was going to call his supplier, made a call from a nearby telephone booth, and returned to Baker's car. He told Baker that his source said that the sale of one ounce of cocaine could be done in one hour.
 
 
 12
 One hour later, Baker picked up Dickie, who said the sale was on and that they had to go to the house of the supplier's girlfriend. Baker again parked near the 1400 block of Locust Street. Dickie said that he was going to get the cocaine from his supplier and made a telephone call from the same telephone booth he had used earlier. DEA Agent Stuart saw Morton's Electra still parked in the 1400 block of Locust Street at this time. Dickie walked down Locust Street and entered the apartment building at 1402 Locust Street.
 
 
 13
 Dickie returned on foot to Baker's car several minutes later and directed him to drive around. During the drive, Dickie gave Baker 30.37 grams of cocaine of 57% purity and Baker gave Dickie $2,200.
 
 
 14
 Dickie agreed to sell Baker a second ounce of cocaine later that day. Saying that he had to take the money from this purchase of cocaine to his supplier, Dickie left Baker's vehicle, walked down Locust Street, and again entered the apartment building at 1402 Locust Street. Three minutes later, Dickie came back to Baker's car, and Baker dropped him off at 2:00 p.m. at the park where they had met for the June 6 cocaine transaction. About twenty-five minutes later, a task force agent saw Morton leave the Bullock Terrace Apartments at 1402 Locust Street, and DEA Agent Morrow saw Morton drive the Electra away from Locust Street and to the A-1 Car Wash.
 
 
 15
 At about 2:50 p.m. on June 19, Baker again met Dickie on Walters Street. At Dickie's direction, Baker and Dickie drove around looking for Dickie's supplier. Baker heard Dickie ask a woman at a bar if she had seen "Melvin." The woman said "No," and Dickie proceeded to the A-1 Car Wash. Later that same afternoon Morton entered 1402 Locust Street. Dickie later stated that his supplier was at his supplier's girlfriend's house in the 1400 block of Locust Street.
 
 
 16
 Dickie then drove Baker's car and parked alongside the same apartment building on Locust Street. Dickie said that his supplier's girlfriend lived in this complex, the Bullock Terrace Apartments; he went inside the complex saying he was going to get the cocaine. He returned to Baker's car a few minutes later and delivered to Baker a bag of white powder (25.52 grams of 64% pure cocaine) for which he received $2,200. Dickie then said he had to give his supplier the money for the cocaine and re-entered the apartments on Locust Street. He stayed about three minutes, returned to Baker's car, and they left shortly before Morton was seen to leave.
 
 III. June 25, 1984: Fourth Sale
 
 17
 On June 25, 1984, Baker met Dickie at the Mathers Street park where they had previously met. Looking for the same cocaine supplier he had used previously, Dickie directed Baker to drive to Locust Street to see if his supplier was at his girlfriend's house. Baker parked beside the Bullock Terrace Apartments and saw Morton's Electra parked nearby. Baker told Dickie that he wanted to meet the supplier. Dickie went into the apartments, stayed for a few minutes, came out, and told Baker that his supplier would not meet with him. Baker dropped Dickie off at the park, consulted with another agent, and then returned to meet Dickie there. When told that Baker would not buy cocaine that day because the supplier would not meet with him, Dickie suddenly agreed to introduce Baker to him. Almost immediately thereafter, however, Morton was seen to leave the apartment and drive away.
 
 
 18
 Baker and Dickie went from the park to Locust Street, and Dickie went into the same apartment once again. After a few minutes, Dickie came out and said that his supplier had gone to run an errand. About this time, Baker observed Morton drive up, park, and alight from the Electra carrying a brown bag. Dickie told him that Morton was his cocaine supplier. Dickie and Morton conversed outside the apartment. Morton entered the same door that Dickie had used earlier, and Dickie returned to Baker's car. Dickie told Baker that his supplier had agreed to meet Agent Baker after the cocaine sale was completed, but he was to dispose of the cocaine before the meeting took place. Baker agreed. Dickie then entered the apartments by the same door and returned to Baker's car a few minutes later.
 
 
 19
 Dickie delivered to Baker another bag of white powder (26.54 grams of 56% pure cocaine) and Baker gave him $2,100. Telling Baker that he was to deliver the money to his supplier, Dickie re-entered the apartment using the entrance Morton had used earlier. Baker, however, failed to meet Morton personally.
 
 IV. Other Circumstances
 
 20
 Morton's girlfriend, Venus Dudley, lived in the Bullock Terrace Apartments at 1402 Locust Street in June, 1984. Morton visited Venus Dudley and their child, Melva, frequently at this time. Morton used the telephone at Venus Dudley's apartment, and was photographed by task force agents entering and leaving 1402 Locust Street on June 19, 1984, at the time of cocaine transaction between Dickie and Baker. Morton admitted at trial that it was he in the photographs. Dudley denied ever seeing Morton give away or sell drugs, or possess cocaine. She did not, however, think Morton knew anyone else in the apartment complex.
 
 
 21
 Previously, in January, 1981, Morton had been convicted of felony trafficking in a controlled substance (16 pounds of marijuana) out of the apartment of another female with whom he was associated.
 
 II. Discussion of Facts
 
 22
 Morton did not move for judgment of acquittal either at the close of the government's case, or at the close of all the evidence. The government argues that Morton's failure to move for judgment of acquittal precludes appellate review of his claim of insufficient evidence absent a "manifest miscarriage of justice."
 
 
 23
 Rule 29 of the Rules of Criminal Procedure allows, but does not require, the defendant to move for judgment of acquittal. Numerous cases, however, have developed the rule that "[w]here no motion for judgment of acquittal was made, it is the general rule that an appellate court is not required to pass upon the sufficiency of the evidence." United States v. Cooper, 321 F.2d 456, 457 (6th Cir.1963) (citations omitted); United States v. Ross, 477 F.2d 551, 552 (6th Cir.), cert. denied sub nom., Sain v. United States, 414 U.S. 912 (1973); United States v. Pasquinzo, 334 F.2d 74, 75 (6th Cir.1964).
 
 
 24
 We have considered this situation in other criminal appeals.[1] Professor Wright states that "[t]here is a seemingly well-settled doctrine that if no motion for judgment of acquittal was made in the trial court, an appellate court cannot review the sufficiency of the evidence." 2 C. Wright, Federal Practice and Procedure Sec. 469, at 672 (2d ed. 1982) (footnote omitted); United States v. Long, 537 F.2d 1341, 1342 (5th Cir.1976); United States v. Luther, 521 F.2d 408, 411 (9th Cir.1975).
 
 
 25
 We are not called upon, therefore, to review the sufficiency of the evidence without a showing by defendant of "manifest miscarriage of justice." See United States v. Long, supra, ("Appellant did not move for a judgment of acquittal at the close of the evidence; thus, the question of the sufficiency of the evidence was not preserved for appellate review absent a manifest miscarriage of justice.") (citation omitted).
 
 
 26
 Here, Morton's trial attorney did not move for acquittal either at the close of the government's case or at the close of all the evidence. Therefore, absent the required showing of a miscarriage of justice, the question whether there was a sufficiency of the evidence to sustain Morton's convictions need not be addressed by this court. Upon examination of the entire record, we are satisfied that defendant has not carried this substantial burden on appeal.
 
 
 27
 The strong circumstantial evidence of Morton's guilt herein detailed and the co-defendant's implication of Morton is entirely sufficient for a jury to convict him.[2] Accordingly, the district court's judgment is AFFIRMED.
 
 
 
 [1]
 We have held that defendant has waived a challenge to the sufficiency-of-the-evidence without first moving for acquittal. E.g., United States v. Faymore, 736 F.2d 328, 334 (6th Cir.), cert. denied, 469 U.S. 868 (1984), ("Yet, even if sufficient evidence did not support these verdicts, ... [a]bsent a manifest miscarriage of justice, we are unable to review the district court's denial of a Rule 29 Motion where the defendant did not renew that Motion at the close of all of the evidence.") (citations omitted, emphasis in original); United States v. Van Dyke, 605 F.2d 220, 225 (6th Cir.), cert. denied, 444 U.S. 994 (1979) ("The defendant did not renew the motion [to acquit] at the close of all of the evidence. This constituted a waiver of his objection to the denial of his motion ... on that ground.") (citation omitted); cf. United States v. Calderon, 348 U.S. 160, 164 n. 1 (1954) ("By introducing evidence [after moving to acquit at the close of the government's case], the defendant waives his objections to the denial of his motion to acquit.") (citation omitted)
 
 
 [2]
 If we were to address the merits of Morton's appeal, there is easily enough circumstantial evidence to conclude, beyond a reasonable doubt, that Morton was indeed "Dickie's" supplier and guilty as charged