David R. BERENT; Robert R. Bonner; Gary F. Jacobs; Janina M. Jacobs; and Joel N. Levine, Plaintiffs–Appellants,

v.

KEMPER CORPORATION and Federal Kemper Life Assurance Company, Defendants–Appellees.

No. 91–1912.

United States Court of Appeals, Sixth Circuit.

Argued March 24, 1992.

Decided Aug. 31, 1992.

Charles J. Porter (argued and briefed), Hardig & McConnell, Bloomfield Hills, Mich., James S. Thorburn, Birmingham, Mich., Leonard Lemberg, Richard G. Partrich, Lemberg & Partrich, Southfield, Mich., for plaintiffs-appellants.

Susan Artinian, Dykema & Gossett, Detroit, Mich., Donald E. Egan (argued and briefed), Paul R. Garry, Mary E. Hennessy, Katten, Muchin & Zavis, Chicago, Ill., for defendants-appellees.

Before: NELSON and BOGGS, Circuit Judges; and WELLFORD, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This is a civil RICO case in which the plaintiffs allege a pattern of fraud in the sale of hundreds of millions of dollars worth of single-premium whole life insurance policies. The defendants are said to have paid interest to the purchasers at inflated rates during the first policy year, while planning to pay at lower rates later. The district court entered summary judgment for the defendants, 780 F.Supp. 431. Finding no error, we shall affirm the judgment.

I

Federal Kemper Life Assurance Company, a wholly owned subsidiary of Kemper Corporation, (collectively, "Kemper") offers a variety of insurance products through a network of independent agents. This suit concerns two such products, "RL-3" and "RL-3SP" single-premium whole life insurance policies.

Since 1984 Kemper has sold literally thousands of RL-3 and RL-3SP policies. Apparently it continues to sell them. The plaintiffs, who seek to represent a class of similarly situated purchasers, bought policies of this type between July of 1984 and February of 1986.

The contracts at issue are insurance policies that have a prominent investment feature. Customers pay a single lump-sum on purchase. The lump-sum payment is greater than the first premium would be if the customer were taking out a policy with premiums payable periodically. The difference between the lump-sum payment and the insurance cost for the first year is used to create a "cash accumulation fund" on which the policyholder earns interest. Every year Kemper deducts from the policyholder's account the cost of insurance for that year. When the policyholder dies, a multiple of the cash accumulation fund is paid out as a death benefit. Kemper's sales brochures explain the policy this way:

> "With a single premium of $5,000 or more, you purchase a completely paid up life insurance policy. You never pay another cent. But that's not the end; it is just a beginning. After we deduct the cost to insure your life, the balance of your single premium begins immediately to earn the current interest rate. That balance and accumulated interest is your cash accumulation fund.
>
> Out of your cash accumulation each succeeding year, we will again subtract your cost of insurance; you don't have to worry about billing notices and payment checks. Each year, your cash accumulation account continues to grow."

At the beginning of each policy year, Kemper decides what that year's "current interest rate" will be for cash accumulation funds. Kemper guarantees that the rate will be at least 4 percent (4.5 percent for the RL-3 policy) and that the year's insurance cost will never be as great as the interest earned for that year; a policyholder's cash accumulation fund can never de-

crease, therefore, although there may be years in which it does not grow by much.

Taxes are deferred on the interest earned, which is what makes such policies attractive to many people. (A penalty is incurred if the policy is terminated, which reduces the attractiveness.) The rate at which the cash accumulation fund grows depends, obviously, on the rate of interest paid and the cost charged for insurance. Kemper's RL–3 sales brochure explains it thus:

> "Both the cost of insurance and the current interest rate affect your cash accumulation and death benefit. The cost of insurance is fairly predictable; expenses can be tracked and so can mortality experience which, by the way, continues to be very positive. Interest rates are less predictable, especially in an inflationary economy. The interest rates we apply to your policy reflect our own earning experience; that's why it's important with an interest-sensitive policy like RL–3 to know that the company issuing the policy is well-managed, financially sound, and has a solid reputation for prudent financial decisions. We promise you that we will keep our current interest rate competitive with prevailing interest rates throughout the economy.... If the interest rate goes down and the cost of insurance goes up, your cash accumulation slows accordingly; at worst, your death benefit will remain level...." [1]

The plaintiffs contend that the statement "[t]he interest rates we apply to your policy reflect our own earning experience" would cause a reasonable person to believe that there is a fixed relationship between the annual yield on Kemper's own investments and the per annum rates at which it pays interest on cash accumulation funds.

During the period when the plaintiffs bought their policies, Kemper paid interest on new policies at rates of 11.5 or 12 percent per year. The plaintiffs contend that these introductory rates were higher than the returns Kemper was earning on its assets. From 1984 to 1986, Kemper's average investment yield on its own assets is said to have been between 10.62 percent and 11.25 percent per year.

At the beginning of 1987 Kemper announced that as of March 1 of that year it would pay interest of 7 percent on existing policies and 8.25 percent for the first year of new policies issued after that date. Kemper had nonetheless enjoyed a higher average return on its assets in 1986 than it had in 1985. The plaintiffs contend that Kemper engaged in a "bait and switch" fraud, selling single-premium policies by promising high first-year interest rates and then lowering the rates paid in subsequent years notwithstanding increases in its own investment yield.

The plaintiffs filed a complaint in federal court alleging securities fraud, civil RICO violations premised on a pattern of securities fraud, civil RICO violations premised on a pattern of mail and wire fraud, and Michigan common law fraud. Each defendant filed a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P. The plaintiffs then moved for leave to amend their complaint. Apparently unaware of the motion for leave to amend, the district court granted the motions to dismiss. Later, however, the court granted a motion for post-judgment relief and permitted the plaintiffs to amend their complaint.

The plaintiffs filed an amended complaint in which they attempted to cure some of the defects in the original pleading. Again the defendants moved to dismiss. The district court (Rosen, J., to whom the case had been reassigned) considered various exhibits submitted by the parties and treated the motions to dismiss as motions for summary judgment. The court found that the insur-

---

1. The RL–3SP sales brochure differs slightly: "Interest rates are less predictable. They are affected by specific financial conditions and the general state of our economy. We can tell you with confidence that our own investment and earning experience has been very good; we expect it to continue to be favorable. That's why it's important with an interest-sensitive policy like RL–3SP to know the company issuing it is well-managed, financially sound, and has a solid reputation for prudent financial decisions. We intend to keep our current interest rate competitive with prevailing rates throughout the economy."

ance policies were exempt from the anti-fraud provisions of the federal securities laws and that the complaint failed to plead mail and wire fraud with sufficient particularity. The court also found that as a matter of law the language in the sales brochure informing readers that interest paid on the policies "reflect[s] our own earning experience" was not a misrepresentation. Summary judgment was entered in favor of the defendants on all federal claims, and the pendent common law fraud claim was dismissed without prejudice.

The plaintiffs have perfected a timely appeal. Abandoning their securities fraud claim and the RICO claims predicated thereon, they contend that the district court erred in dismissing those of the RICO claims that were based on mail and wire fraud.

## II

■ The plaintiffs argue as an initial matter that the district court committed reversible error by relying on the vacated opinion and order dismissing the original complaint. The argument is unavailing. Although the district court did quote from the vacated entry, it did so to adopt the first judge's analysis insofar as the earlier opinion was thought to be correct and insofar as the amendments to the complaint did not render the analysis inapplicable. There is no indication that Judge Rosen relied on the earlier opinion as authority. His use of the opinion does not, of itself, require reversal.

The plaintiffs' RICO claims are based on alleged violations of 18 U.S.C. §§ 1962(a) and (c). These sections provide in pertinent part as follows:

"(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in ... interstate or foreign commerce.

* * * * * *

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

The "pattern of racketeering activity" in which the plaintiffs allege that Kemper engaged is mail and wire fraud. Section 1961 defines racketeering activity in terms that include "any act which is indictable under ... section 1341 (relating to mail fraud), [or] section 1343 (relating to wire fraud)." The plaintiffs in this case must allege facts sufficient to establish a violation of either 18 U.S.C. § 1341 or 18 U.S.C. § 1343. The district court concluded they did not. We agree.

■ The elements of mail or wire fraud are (1) a scheme or artifice to defraud, and (2) use of the Postal Service or interstate wires for the purpose of executing the scheme or artifice. 18 U.S.C. §§ 1341, 1343; *Hofstetter v. Fletcher*, 905 F.2d 897, 902 (6th Cir.1988). A scheme to defraud within the meaning of the federal statutes must involve "misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Walters v. First Tennessee Bank, N.A., Memphis*, 855 F.2d 267, 273 (6th Cir.1988), *cert. denied*, 489 U.S. 1067, 109 S.Ct. 1344, 103 L.Ed.2d 812 (1989).

■ The plaintiffs' theory is that Kemper attracted business by paying inflated first-year interest rates for new policies. Customers were allegedly led to believe that those first-year rates bore a defined relationship to Kemper's own past investment returns; that future interest rates paid to policyholders would bear the same relationship to Kemper's future investment returns; and that, all else being equal, Kemper would continue to pay rates consistent with the first-year rates so long as the yield on its own investments did not decline. Although customers were warned that interest rates paid on cash accumula-

tion accounts could go up or down, the plaintiffs contend they were led to believe that the change in rates paid on their accounts would directly track the change in yield earned by Kemper on its own investments. In reality, the plaintiffs contend, Kemper intended from the outset to pay lower rates to existing policyholders no matter what happened to the yield on its own investments.

We do not think the promotional literature contained misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. The language in the promotional literature on which the plaintiffs rely most heavily is this:

> "The interest rates we apply to your policy reflect our own earning experience; that's why it's important with an interest-sensitive policy like RL–3 to know that the company issuing the policy is well-managed, financially sound, and has a solid reputation for prudent financial decisions." [2]

Like the district court, we do not believe that a reasonable jury could read this as promising a direct relationship between Kemper's yield on its own investments and the rate paid to policyholders. Nowhere does the phrase "direct relationship" appear in the sales brochure. Nowhere are there any promises that interest paid to policyholders will match Kemper's average yield on its own investments. The sales brochure does not say that future interest rates will bear the same relationship to the yield on Kemper's own investments that first-year rates bore to past yields. Although the brochure does say that interest rates "reflect" Kemper's earning experience, there is no indication of the period of time involved or the degree of fidelity with which Kemper's experience over the undefined time period has been or will be reflected. The only firm promises made by Kemper are that (1) the annual interest rate will be at least 4 percent for the RL–3SP policy and 4.5 percent for the RL–3; (2) once declared, the "current interest

rate" will remain in effect for one year; (3) insurance cost will never be as great as the interest earned for that year; and (4) "we will keep our current interest rate competitive with prevailing interest rates throughout the economy." The plaintiffs do not allege that any of these promises was not kept.

This case is unlike *Hofstetter v. Fletcher*, 905 F.2d 897 (6th Cir.1988), where an insurance agent induced the plaintiff to buy life insurance by falsely representing to her that she could completely avoid future payments of federal income taxes. Neither is this case like *United States v. Van Dyke*, 605 F.2d 220 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). There the defendant sold jewelry distributorships to investors by making "representations or promises" that were "in part or wholly false." 605 F.2d at 223. Investors were not sent the jewelry shipments they had been promised; some were sent no jewelry at all. Investors were promised 20 retail locations to which they would have exclusive distribution rights; many investors received no retail locations at all. Sales figures were wildly misrepresented, and financial histories were fabricated. The defendant referred prospective investors to "fellow investors" for information on the success of their distributorships, and the "fellow investors" were secretly paid by the defendant to misrepresent the success of the venture. *Id.* at 224.

In the case at bar, by contrast, the plaintiffs have shown no false representations; they have merely shown that they drew inferences which turned out to be incorrect for a time. (As of this writing, at least, tax-deferred guaranteed interest of 4 percent or more would appear to compare rather favorably with the taxable interest currently paid on money market funds or demand deposits at financial institutions.)

The plaintiffs contend that it was Kemper's practice to pay a significantly higher rate in the first year of a policy than it

---

**2.** The corresponding language in the RL–3SP promotional literature also refers to that policy as "interest-sensitive," which it unquestionably

was. The RL–3SP does not use the "reflect our own earning experience" language.

intended to pay the policyholder in subsequent years, and that the failure to disclose this practice constitutes a material omission. The plaintiffs also contend that it would be a material omission not to disclose that Kemper's first year rates were higher than the yield on Kemper's own investments.

As a matter of law, such omissions would not be actionable. The plaintiffs have described a "loss-leader" marketing strategy that may have given them an extra-good deal in the first year or two of their policies, but that did not promise correspondingly high interest rates in future years. The promise was that future rates would be "competitive" with rates prevailing throughout the economy. In fact, the brochure for the RL-3SP product discloses the possibility that rates will not necessarily be the same for new policies and existing policies:

> "Because your interest rate is guaranteed one year at a time, it is possible that the rate applied to existing policies *could* be higher or lower than the current declared rate offered to those purchasing RL-3SP brand new. That possibility for difference exists because of changing yields on investments from one year to another." (Emphasis in original.)

The sales brochures for both policies explicitly warn that the current interest rate may decrease in future years.

Because we conclude that the plaintiffs have shown no violation of the mail or wire fraud statute, we need not analyze the other elements necessary to sustain the RICO claims predicated on a pattern of such violations.' The judgment of the district court is AFFIRMED.